[No. G034442. Fourth Dist., Div. Three. Oct. 30, 2006.]

UIKILIFI NIKO, Plaintiff and Appellant, v.
ROBYN FOREMAN, Defendant and Respondent.

**Counsel**

Henry James Koehler IV for Plaintiff and Appellant.

The WSU Legal Clinic and Terence W. Roberts for Defendant and Respondent.

## Opinion

**O'LEARY, J.**—Uikilifi Niko appeals from the trial court's order modifying a prior child custody judgment and establishing a new coparenting plan. Niko is the father and Robyn Foreman is the mother of Taylor. The prior judgment granted the parents joint physical custody with essentially a 50/50 division of physical custody time and provided that neither parent could change the child's residence to a location outside the state of California without the written permission of the other party, or alternatively, by order of the court. The modification order at issue continues the joint custody order, but allows Foreman to change Taylor's residence to Colorado and significantly changes Niko's physical custody time with his son. Under the new coparenting plan, Foreman will have the physical custody of the child during the school year and Niko will have physical custody during summers, a portion of each winter vacation, and alternating Thanksgiving vacations and spring breaks.

Niko asserts the court applied the wrong standard in deciding Foreman's modification petition, improperly considered the preference of the minor, and erroneously denied his motion to dismiss the petition and his motions for sanctions. We affirm the order.

I

### Factual Background

Niko and Foreman, who were unmarried, had a romantic relationship which produced their son, Taylor, in 1991. At the same time Niko was dating Foreman, he was also dating another woman, Elizabeth. Shortly after Taylor's birth, Niko married Elizabeth, and they remain married to the present time.

Despite Niko's marriage, however, Niko and Foreman engaged in at least three reconciliations of their romantic relationship over the next several years. As late as 1998, Niko and Foreman resided together for a period of time. Their romantic relationship rekindled most recently in late 2001. Interspersed among Niko and Foreman's reconciliations were some periods of discord regarding the care and custody of Taylor.

In September 1996, during one period of discord, Niko filed a complaint to formally establish his parental relationship with then five-year-old Taylor, and requested a "50 [percent]–50 [percent] time-sharing physical custody" order. While Foreman readily admitted Niko's paternity, over the course of the next

four years, Foreman and Niko battled over what the appropriate custody arrangement would be for their son. Finally, after much acrimony, in February 2001, an agreement was reached, and the court entered a stipulated judgment. It decreed Niko was both the "natural and legal father" of Taylor, and Foreman was Taylor's "biological and natural mother." The judgment also governed the details of Taylor's custody and support. Among other things, the judgment provided Niko and Foreman would have joint legal and joint physical custody, and specified the manner in which their periods of essentially equal physical custody would be divided.[1] The judgment also provided that "neither party hereto shall change the minor [child's] residence to a location outside the state of California without the express[] written permission of the other party or alternatively by order of the court."

In November 2002, Foreman filed an order to show cause (OSC) to modify the custody arrangement, seeking permission to move to Colorado with Taylor and sole physical custody of Taylor. She filed a declaration stating her request was motivated primarily by financial considerations, explaining she co-owned her home in Irvine with her father, and he had been, in effect, subsidizing her living expenses. That subsidy was not going to continue, and under those circumstances, Foreman concluded she was "no longer able to afford to live in the Orange County area." She explained her sister had resided in Colorado since 1996 and owns a business there. The sister had offered Foreman employment. Foreman claimed Taylor had wanted to move to Colorado ever since 1996, when his cousins moved there.

Foreman further declared, as an additional reason for the move, that Niko was "becom[ing] more and more obsessed" with Taylor's football workouts, and was making "derogatory remarks" to him. She asserted Niko was "strik[ing Taylor] in the head with an open hand[]" so that Taylor could " 'learn how to take a hit.' " She claimed this was "part of . . . Niko's obsession with 'making a man out of [him].' " Foreman stated she was "concerned for Taylor's physical well being." She concluded her declaration with what can only be described as a plea: "Niko is [six feet five inches tall] and a police officer. He is very controlling. Taylor is not allowed to ever speak his mind in his father's presence. Taylor needs help."

---

[1] After specifying the parties would enjoy "joint legal and joint physical custody," the judgment states Foreman would have "primary physical custody" with Niko having the "following custodial periods." The described "custodial periods," spanning Sunday from 8:30 a.m. to Wednesday at 5:00 p.m. one week, alternating with Sunday from 12:00 p.m. to Wednesday at 5:00 p.m. the next, amounted to roughly 50 percent of Taylor's time. The court found this amounted to a true 50/50 split of custody, with Foreman entitled to no presumptions in her favor. We agree. The described time split does not amount to "primary custody" to either parent.

Niko opposed the OSC. On December 9, 2002, he filed a response denying any abuse of Taylor, and asserting Foreman's stated justifications for moving away were "suspect." He suggested her true motivation was related to the fact Elizabeth had become pregnant with their first child early in 2002. He argued Taylor was doing extraordinarily well under the status quo, and his best interests would not be served by moving to Colorado.

Niko also requested the court order Foreman to pay his "attorney's fees of $5000 by reason of bringing this action in bad faith[]" pursuant to Family Code section 271.[2] In his attached declaration, Niko asked the court "to dismiss this [OSC] Re: 'Move Away' because I believe it is brought in bad faith." Niko indicated Foreman's real motivation for the move was to prevent Taylor from bonding with his new sibling whose birth was expected on or about January 10, 2003. Niko stated he did not believe Taylor wanted to move, but rather than asking him directly, Niko took Taylor back to Donald Smith, Ph.D., one of the experts who had evaluated the custody plan during the prior paternity action. Niko stated he informed Foreman of his plan and invited her to participate in the evaluation process, but she did not. Niko stated Smith had informed him that Taylor preferred to maintain the status quo.

Over the next year, Foreman and Niko battled much the same as they had prior to reaching the original custody stipulations. Immediately after Niko filed his response, Foreman was granted a continuance of her OSC and a few months later filed another OSC, seeking appointment of an attorney to represent Taylor. In support of her request, Foreman asserted that Niko had arranged for Taylor to be interviewed by Smith without her "consent," and she was not "invited to participate in . . . Smith's interviews." She also asserted that based upon her own discussions with Taylor, Smith's report recounting Taylor's statements was a "complete fabrication." The parties stipulated, and the court appointed, Harold LaFlamme to act as independent counsel to represent Taylor.

The next skirmish occurred within one month when Niko sought an order requiring Foreman to submit to a "[v]ocational rehabilitation examination" to determine whether she was capable of earning a sufficient living to remain in California. He also filed a motion in limine to disqualify LaFlamme from continuing to represent Taylor, alleging he had engaged in tactics designed to intimidate Smith and prevent him from testifying in the action. The motion to disqualify LaFlamme was denied, and the next month the court appointed Duke Bussey, Ph.D., an associate of the first custody evaluator in the paternity action, to conduct a custody evaluation in connection with Foreman's OSC.

---

[2] All further statutory references are to the Family Code, unless otherwise indicated.

Finally, in January 2004, the hearing on Foreman's OSC began. At the commencement of the hearing, LaFlamme informed the court Taylor "enjoys a good relationship with both of his parents and his parents seem to—up until now, been able to share him quite well. [¶] In [Taylor's] interest, I support the appropriate position that he move to Colorado." He explained Taylor had been consistent in expressing to him the desire to go to Colorado, and stated his own belief Taylor was of "sufficient age and maturity to make the choice."

Before taking testimony, the court attempted to reach an agreement with counsel concerning the standard by which Foreman's modification request would be judged. The record reflects a lengthy and somewhat confusing discourse took place between the court and counsel. At the end of this exchange, the court concluded, "we are on the same page as to what I need to look at." The court proceeded with a de novo review to determine what custody plan would be in Taylor's best interests.

Bussey was the first witness, and he was asked questions about the contents of his 22-page report.[3] Bussey noted in his report that Foreman based her desire to move to Colorado to be closer to her family and to work in a family-owned business. Foreman informed Bussey that both she and Taylor had "long held a desire to move to Colorado, dating back approximately seven years." She also stated "that [Niko] has been overly rigid and demanding, if not punitive, in his workout activities with Taylor. It is her position that these workouts have had a detrimental effect on the father-son relationship." Niko countered by informing Bussey of his belief that Foreman's reason for the move was "revenge," because of his own "rejection in their adult relationship."

Bussey evaluated both Foreman and Niko positively, but noted that Foreman's score on the "Minnesota Multiphasic Personality Inventory," or "MMPI-2," reflected a "K+ profile type, which is not atypical for custody litigants." He explained that her "K Scale is elevated to 78T, indicating a degree of defensiveness," but concluded that because Foreman had no elevations on the "Clinical, Content or Supplemental Scales that would impact current custody planning and recommendations," he considered the MMPI-data to be "non-contributory."

Bussey observed Foreman to have the better "parent-child" communication with Taylor. Bussey noted that Taylor was able to express to Foreman that he wanted to move to Colorado. When Taylor was with Niko, he was observed as being "unable to express a clear preference." In the face of that indecision, Niko proceeded to persuade Taylor of the reasons he should remain. Bussey opined, based upon this interaction, Niko displayed "very little empathy."

---

[3] Bussey's report was received in evidence, without objection to the foundation, subject to cross-examination.

Bussey also reported Taylor described Niko as being stern, and complained Niko "puts too much pressure on him." Taylor was "clear and consistent" in stating to Bussey he wanted to move to Colorado. He stated his mother was not pressuring him to move, but his father was pressuring him to stay.

Bussey concluded "Taylor is doing very well in his current academic environment[]" and he is "well rounded from an extracurricular standpoint excelling in a number of sports . . . ." Bussey believed "Taylor [was] more bonded to [Foreman,]" and has some fear about expressing his preferences openly with Niko. Taylor "expressed a preference to move to Colorado and . . . this preference shows many of [the] hallmarks of a mature preference."

Bussey viewed his own role as strictly one of evaluating whether Taylor should live with Foreman in Colorado, or with Niko in California. He stated, "It is outside the scope of my consideration to describe a scenario in which Taylor would reside here with both parties."

Bussey reported he could not conclude Foreman was acting in bad faith in her request to move with Taylor, although he expressly discounted her financial motive. Bussey also expressed "concerns about certain stressers [*sic*] that are existent in Taylor's relationship with father. Father appears to be the less empathetic parent . . . . Taylor is more distant from father and therefore may not rely and confide in him in seeking guidance through the continued formative years through early and mid-adolescence as he might mother." Bussey did not believe Niko's workouts with Taylor were abusive, characterizing them instead as "strenuous and demanding." He questioned their benefit and expressed concern Niko's authoritarian style might adversely impact Taylor's self-esteem. Finally, Bussey discounted the significance of Taylor's ties to his extended family, on both sides. "Taylor does not appear to be particularly close to either extended family by his own verbalizations." Bussey did state there was "some relative positive experience, however, to be gained by continual involvement with Liz, Taylor's stepmother, and his young sister, Alexa [Niko's daughter], with whom Taylor is close."

Based upon all the foregoing, Bussey recommended the parties retain joint legal custody, but that Taylor reside in Colorado with Foreman. He suggested Niko have the option of visiting with Taylor coinciding with nonschool time on weekends, "upon pre-arrangement between the parties," and that Taylor would spend six weeks per summer with Niko. The Thanksgiving and Christmas holidays would be shared, and spring break would be spent with Niko in California.

Bussey testified consistently with his report. He acknowledged that "in general, perhaps [it's] better[]" for a child such as Taylor to "stay here and everyone else to stay here," but emphasized that was not a scenario he considered: "I looked at . . . Taylor residing in Colorado with mother or residing here with father." Bussey also stated, "Taylor has quite a great deal to benefit from remaining in contact with both parents in particular these parents. I think they provide very different things for this particular individual child." Bussey agreed that moving Taylor to Colorado, and consequently limiting the frequency of his contact with Niko, would create a risk the father/son relationship would "deteriorate." However, Bussey believed it was up to Taylor and Niko to ensure that did not happen by taking full advantage of opportunities for communication and visitation.

Bussey expressed the opinion Foreman was acting in good faith in her decision to move to Colorado, while at the same time acknowledging he believed the fact Niko had ultimately rejected her, in favor of remaining with Elizabeth, was "a central motivator for her." When the court questioned whether "a parent who chooses to move, taking a child who has a 50/50 relationship primarily with both parents, by choosing to move that child elsewhere, thus reducing that time shared in the relationship, really [has] the best interest of the child at heart," Bussey did not answer directly. He first deflected with "it's a very difficult decision to make," and later noted, "I'm trying my best to be somewhat diplomatic." He did, however, finally agree Foreman had Taylor's best interests at heart.

Niko's counsel asked Bussey about Foreman's elevated "K-Scale" result on the MMPI-2, which he had discounted as "non-contributory." Bussey acknowledged the K-Scale is "like an auditor that monitors the rest of the test for its validity or invalidity." He characterized it as an indication of "degree of defensiveness." He explained, however, that while "50" was the median score, and "65-T" was the cutoff before a score was considered "elevated," there was "a common elevation on the K-Scale for custody litigants, slightly above 65-T—65 and 70-T will be for that population." Bussey agreed that Niko's K-Scale was not elevated at all.

Finally, Bussey also stated that in his view, both Colorado and California offered Taylor comparable schools, and essentially "the same opportunities and the same activities[]" for Taylor.

Foreman testified at length as well. Initially, she acknowledged she was no longer under pressure to move from her Southern California home. She stated her father had "just changed his mind, pretty much because his grandson lives in it, not so much for me. He says they're not going to make me sell the house." Her father's change of heart, however, did not affect Foreman's decision to move.

She also acknowledged Niko had stopped Taylor's physical workouts entirely after she filed her OSC. She agreed that her prior concern about the impact those workouts were having on Taylor was "not at issue anymore," but stated that also had no effect on her decision to move.

Foreman then explained that her number one reason for moving to Colorado was "family." Both her mother and sister (with husband and children) lived there, and she described Taylor as having a close relationship with these relatives, especially two girl cousins near his own age. In the past, she had taken Taylor to visit about three times per year, but had been able to do so less since the OSC had been filed. She opined Taylor missed them, and said he "talks about them all the time."

Foreman had previously been employed as a deputy sheriff, but an off-duty injury to her arm lead to her termination. Since then, she had worked in various capacities, most recently as an administrative assistant. After being laid off from that job, she had been working for a "temp" agency. She had not been making any effort to find a new permanent position because of her intention to move.

Foreman's plan was to work for her sister's company, Paradise Bakery Café, upon her move to Colorado. She anticipated doing accounts payable and receivable in the corporate office, plus working "in the Aspen store." She acknowledged that Paradise Bakery Café had two stores in Southern California, but stated she could not work in those, as one had been franchised to a different owner, and the other already had a manager and was "up for sale." She anticipated living with Taylor in her sister's home initially, but then purchasing her own home.

Foreman agreed that by any measure, Taylor had been doing exceptionally well under the joint custody plan. He was in the "GATE" (accelerated) program in his Irvine middle school, excelled in several sports, enjoyed drawing and painting, and had an active social life. Foreman explained the school he would attend in Colorado was "equivalent in all areas [to his current school], a great school." She stated he would be able to continue with honors classes, sports, and art.

Foreman testified she had wanted to move to Colorado for "quite a while," and had been "serious[ly] considering it, in the last six years." She stated that in 1998, during one of their reconciliations, she and Niko even discussed moving to Colorado together as a family with Taylor.

Foreman said Taylor had also wanted to move to Colorado for about six years, since the first time he had visited after her family moved there. However, Foreman had discounted his preference initially, because she felt Taylor did not really understand the ramifications of moving, and had not been mature enough to make that decision. Now that he was 12, Foreman believed Taylor was expressing a more mature perspective.

On cross-examination, Foreman acknowledged she had been advised, via e-mail, of Niko's intention to take Taylor for reevaluation by Smith in December 2003. She testified she had been "shock[ed]" by the second report generated by Smith, reflecting Taylor preferred to stay in California and leave things as they were. After reading the report, she questioned Taylor directly about it and encouraged him to read it. When Taylor told her Smith's statements were untrue, she encouraged him to type up a rebuttal document, reflecting what he "actually did say." In doing so, she was not intending to pressure Taylor and denied it had that effect.

Foreman agreed Niko was not a bad father, that Taylor loved him, and their relationship was important. She expressed her intention that if she were allowed to move with Taylor to Colorado, she would "do anything" to help the relationship between Taylor and Niko "mature and develop."

Foreman also agreed she had made prior representations to the court in 1998, denying any intention of moving to Colorado. She acknowledged she had stipulated to a judgment in 2001, specifying that Niko would have custody of Taylor half of each week. Foreman stated she was not compelled to move to Colorado by reason of marriage or request of a current employer. When Foreman was asked "if anything [had] changed" between the time she had stipulated to the judgment and the time she filed her [OSC], her counsel objected. He noted the standard to be applied was "de novo," and thus the issue of changed circumstances was irrelevant. The objection was sustained, and the court directed Niko's counsel to ask a more specific question.

Counsel asked Foreman if she had previously stated she had no intention of moving to Colorado, what had occurred to change her mind about moving there. She explained it was simply because "Taylor . . . grew up and he matured. Circumstances and life changed and this time it felt like it was the right time. I see my family less and less. That's not acceptable to me." She acknowledged that in 1998, she had stated she "ha[d] no intention of disrupting [Taylor's] life and moving him out of state," but denied her current plan to move would amount to a disruption: "Change it? Yes. Disrupt? No."

Foreman also admitted she had, on one occasion in 1998, during the heat of an argument, suggested to Elizabeth that one reason Niko was leaving Elizabeth and coming back to her was that Elizabeth was unable to get pregnant and Niko wanted more children.

During cross-examination, Foreman indicated she had checked Smith's license with the California Board of Psychology (the Board) and found he was on probation. She later filed a complaint with the Board against Smith.

Elizabeth also testified. Among other things, she described the sometimes messy interactions between herself and Foreman, including more than one incident in which Foreman had told her that Niko could never really be happy with Elizabeth, since she had been unable to give him more children; and one incident in which Foreman had threatened she and Taylor would move to Colorado if Niko was not "going to be in their life." Elizabeth also addressed the quality of the home life she and Niko shared with Taylor and their new daughter, as well as the prohibitive costs, and effort, involved in traveling between Southern California and Basalt, Colorado, the town where Foreman intended to relocate.

Niko called a licensed clinical psychologist, Sidney Brown, as a witness. All parties agreed Brown was an expert in the field of child custody and child custody evaluations. Brown testified he had reviewed the raw testing data upon which Bussey had based his evaluation of the parties. Brown testified Foreman's elevated K-Score of 78 on the MMPI-2 was significant. He explained the K-Scale is based upon a series of 30 questions relating to "virtue," questions such as " 'Have you ever lied in your life? Have you ever stole[n] anything? Have you thought bad thoughts, gotten angry and gotten over it?' " The expectation is that a person answering honestly will have a range of "yes" and "no" answers. Foreman's K-Score of 78 was based upon her answering "no" to 28 out of the 30 questions. Such a result indicates Foreman was engaging in "impression management," i.e., attempting to make herself look more virtuous than she really is. Brown stated that a score of 78 on the K-Scale "totally invalidates the clinical profile of the testing."

Brown also opined Bussey's decision to disregard Foreman's elevated K-Scale was improper because all data created in a psychiatric evaluation "is indicated to be utilized not dismissed." He characterized an "extreme score" as part of what demonstrates a party's "patterns of psychological behavior." Brown was concerned Bussey may have been acting "consciously or unconsciously with a certain amount of bias in . . . his dismissal."

Niko testified at some length as well. He described his significant, day-to-day involvement in Taylor's life, including substantial time spent coaching his sports teams. He also described Taylor's frequent contact with extended family members on Niko's side and his involvement with their Samoan culture. Niko suggested Taylor benefited from the multiculturalism that Southern California provided, and expressed concern a move to Colorado would deprive him of that.

Niko recounted his history with Foreman, including her efforts to convince him to leave his marriage to Elizabeth and become a "family" with her and Taylor. During those conversations, he testified Foreman would threaten to take Taylor and move to Colorado if he did not leave Elizabeth. He described one incident in October 1997, in which Foreman had actually taken Taylor to Colorado for a period of nine days, without informing Niko, and he did not know where they had gone. According to Niko, Foreman told him that her reason for doing it was his refusal to divorce Elizabeth and marry her instead.

Niko also testified Foreman had related, in a session they jointly participated in with Bussey, that if the court ordered she could not move to Colorado with Taylor, she would stay in Southern California. She also stated that same intention directly to Niko on another occasion.

Niko was complimentary regarding Foreman's parenting skills, stating that despite the complexities of their own relationship, he believed both of them had always been able to keep Taylor's best interest in mind. He thought Taylor had always had both parents in his life. Despite that positive record, however, Niko believed Foreman's decision to move to Colorado *was* intended to interfere with the relationship between him and Taylor. He explained things changed when his daughter was born because Foreman's hope he would ultimately be with her permanently "was no longer that fantasy that could come true."

Niko also acknowledged Taylor had expressed a desire to him to move to Colorado in March 2003. However, Niko believed the reasons Taylor expressed for the move, i.e., it would be "fun," and his mother had promised he could return for week-long visits once per month were not "mature preferences." In Niko's view, what Taylor really wanted was to keep both parents in his life, which would mean staying in Southern California. His wish to move to Colorado was "as a vacation, yes. As a place to live, no." Niko also believed Taylor's natural tendency was to tell each parent what they wanted to hear, which prompted his decision to take Taylor to Smith for an objective evaluation of his preferences, rather than asking him directly. He believed Taylor had spoken honestly with Smith, but then changed his position when confronted directly by Foreman upon receipt of Smith's report.

Niko's counsel advised the court Smith had declined to testify as an expert witness for Niko. He asserted Smith had been dissuaded from testifying because of alleged pressure tactics employed by LaFlamme and Foreman, including Foreman's decision to file a formal complaint against Smith with the Board. Niko pointed out Smith was the only other expert besides Bussey to have spoken to Taylor directly about his preferences, and had been given a significantly different impression than the one Bussey reported. Under those circumstances, he believed it was important the court hear from Taylor directly.

The court refused the request. The court explained that while a child's preference in a custody case "is an important question," it was highly reluctant to put a child on the stand, testifying under oath. The court indicated it could preclude the calling of a child as a witness and provide alternative means of obtaining information regarding the child's preference. The court stated it had alternative means in place in this case, "One, being the 730 report and the second being child's counsel, . . . LaFlamme." The court explained it had never allowed a child to testify in court in a custody matter, and had personally interviewed a child in chambers only twice, in the company of the child's counsel. Unless children were a victim of a crime, the court opined it was not healthy for a parental relationship or in the child's best interest to allow a child to testify.

When Foreman was testifying, she was asked if she had witnessed any confrontation between her counsel and LaFlamme and Niko's counsel regarding Smith testifying. Foreman's counsel objected and an exchange as to Smith's testimony occurred. Niko's counsel expressed concern Smith was facing a condition of probation hearing and he believed Smith would be risking his career if he were to testify. He indicated Smith worried if a complaint were filed against him by Foreman, her counsel, and LaFlamme, the Board would not let him off probation. The court stated it had no problem with Smith testifying if he wanted to come to court, but indicated it was not going to attempt to resolve the complaint issue. The court's apparent conclusion was that Smith's unavailability was by choice. The court sustained hearsay, relevance, foundation, and privilege objections and then refused to admit Smith's December 2003 report regarding Taylor's custody preference. Sustaining a relevance objection, the court also refused to admit Taylor's rebuttal document as evidence in the case.

After taking the matter under submission, the court issued a lengthy tentative decision permitting Foreman to move with Taylor to Colorado. The court stated that unless any party requested additional findings of material fact, the document would constitute its statement of decision.

In the tentative decision, later adopted as its statement of decision, the court reasoned as follows:

"The decision in this case is a difficult one, but the facts, themselves, call for only one ruling. The [c]ourt has considered the pleadings and papers filed herein as allowed by law, the evidence, both oral and documentary, the arguments of facts and law by counsel[,] and finally, the court's own observations of the demeanor and attitudes of the parties to this proceeding.

"First and foremost, these parents are to be commended for the fine young man that Taylor apparently is, despite his lack of having an intact family unit and his parents' on-and-off-again personal relationship. This failed relationship rests on the shoulders of both parents[,] and the court declines to find fault or use this as any basis for the decision herein.

"At almost 12 years old[,] Taylor by all accounts (that of . . . Bussey, his own attorney[,] . . . LaFlamme[,] and his mother) is of sufficient age and maturity to have a voice in his custodial placement and have the court give weight to that. Interesting, even [Niko] acknowledges that Taylor is a wonderful son with 'good judgment and does not lie.' [Foreman] respects Taylor and his opinions and feelings while [Niko] discounts them . . . It is clear from the 730 report that Taylor, raised separately by parents with different but well-meaning parenting style [*sic*], has started to individuate from [Niko] and bond psychologically more with [Foreman]. The weight and relative convincing force of the competent and credible evidence presented falls in favor of Taylor moving with [Foreman] and the court allows said move.

"The court is not sure what case it is that [Niko] and his attorney were presenting—if it was this case with this child and these parents and that is not in this child's best interest to move, then he has not met his burden. . . . The court gives little or no weight to the testimony of . . . Brown, [Niko's] proffered expert. He did not convince this court, by competent evidence or opinion, that . . . Bussey, the court's 730 expert, was in error in his interpretation of the testing data and interviews. Rather . . . Brown only reinforced, by his lack of credibility and unconvincing testimony, that . . . Bussey was correct.

"The court finds, as persuasive, the conclusions and recommendations of . . . Bussey (as contained in his report received in evidence and his live testimony) when coupled with the desires of the child, wishes that should not be discounted. Adding to this is the lack of competent evidence, from [Niko], to overcome the clear and convincing evidence that it is in Taylor's best interests to move with [Foreman] when she moves to Colorado.

"While it is true that Taylor has a strong bond with [Niko] and an appreciation of his Samoan heritage, this is something that can be maintained even at a distance. In fact, . . . Bussey found that 'that extended family relationships are more a part of each parent's own perception or agenda. . . .' Taylor can continue to maintain and build his bond with [Niko], step mom and new sister during his long visits. Will it be different? Yes. Will it be harmful? Insufficient evidence. Will it be detrimental to his best interests? Insufficient evidence.

"Much was made during trial of [Foreman's] 'threats' to move in an attempt to get [Niko] to leave his wife. The court does not find this to be her motive, nor that her motives are impure. In fact, [Foreman's] long standing desire to move with family in Colorado has been repressed by her so that Taylor could develop a strong unshakable bond with [Niko]. Now, as . . . Bussey found, that Taylor is more attached to [Foreman] and that a 'certain amount of stress' is developing in his relationship with [Niko], the time is ripe. Taylor is mature in his decision making about the move and there is no evidence that he is being manipulated by [Foreman]. Rather, as . . . Bussey relates, the pressure regarding the move isn't by [Foreman] but by [Niko] in pressuring Taylor not to move. '[Niko] appears to be the less empathetic parent and imposes his own agenda on Taylor.' This statement from . . . Bussey was emphasized even in [Niko's] testimony and demeanor. Taylor is being less responsive to [Niko's] authoritarian and punitive style which can damage this child's self-esteem.

"It was not 'negatively' impressive to this court that Basalt, Colorado is a mountain community, a few hours drive from Denver, even though that drive may be more difficult in winter. There is no proof that the community is or will be bad for Taylor—a community offering similar child centered academics and activities as Orange County in a more rural setting. The court did not find relevant the difficulty or distance of travel because there just is no question that travel would not happen. There have been relatively few, if any, instances, of either parent frustrating the other's time, both seemingly understanding the necessity of insuring continuity of contact with the other. The maintenance of the parent-child relationship will be up to the parents, not the child. This case is more about relationships than geography. [Niko] will not be one to allow his contact to diminish because of distance and [Foreman] has not been shown to be one to exclude [Niko]. [Niko's] influence on Taylor is already imbedded in him and he can exert a great deal of influence over his extended custodial time."

The court also noted that when Foreman testified "she spoke passionately about her son, his accomplishments, [and] his needs and struggles. She has researched schools and programs to insure the continuity of Taylor's education, art endeavors[,] and sports." The court indicated it found Elizabeth

"mostly credible." The court concluded, "[Elizabeth] and Taylor have a good relationship and that Taylor is enthralled by his baby sister." The court found Elizabeth's testimony concerning Foreman's past threats to move with Taylor to Colorado if Niko did not leave Elizabeth to be "contradicted by other testimony and the court makes no finding thereon other than it is irrelevant to be [in] the best interests of Taylor, <u>now</u>."

The court then acknowledged that "[i]t is clear, from [Niko's] testimony, that he loves his child and values his frequent contact with him, as does Taylor. But it is also clear that Taylor is different from [Niko] and these differences are getting more pronounced as Taylor matures. [Niko] appears to be unable or unwilling to accept these differences; he fails to acknowledge his son's feelings and discounts them." The court later stated, "[Niko] seems to be the one who is controlling and rigid. For no reason this court can discern, he is fearful that if [Foreman] leaves, she will keep Taylor from him. If history is the greatest predictor of the future, then the facts do not bear this out. Both parents have encouraged the other's time. [Niko] does not believe Taylor's desire to move is mature and he has told Taylor that if he moves, [Niko] cannot be the father <u>he</u> . . . wants to be. Who is this about? [Niko] or Taylor?"

Finally, the court stated: "In making this ruling, the court adopts the recommendations and findings of . . . Bussey and finds his testimony and report credible and supporting the best interest of Taylor. This has been a de novo hearing. The court has considered all the relevant case law and statutes. All relevant circumstances bearing on this child's best interests have been considered to insure that relocation still provides for frequent and continuous contact with [Niko] is sufficient to maintain and strengthen their bond and his influence on Taylor's maturing. Based on evidence submitted and the psychological evaluation, it does."

The court then indicated it had reviewed the then recent opinion of the Supreme Court in *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072 [12 Cal.Rptr.3d 356, 88 P.3d 81] (*LaMusga*), and believed its decision in this case was consistent with it. The court noted this case "would not be one where this court would find it in the best interest of the child to award custody to dad if mom moved."

After the court rendered its tentative decision, Niko filed a request for specific findings, along with points and authorities asserting, among other things, that because the parties shared custody, Foreman was not entitled to

any presumptions in favor of her move-away request under section 7501. He argued the changed circumstance standard must be applied in a situation where one parent is seeking to modify a final judgment pertaining to custody.

As a result of Niko's request, the court added to its findings that the parties shared a " '50/50 time share arrangement of their minor child,' " that "neither parent is entitled to any presumptions in their favor with respect to the move away," that the "court gave neither party such a presumption as it considered this as a 'de novo' hearing regarding custody where the best interest of the minor was the controlling factor," that "[n]either parent argued change of circumstances and in fact it was agreed at the start of the trial that this hearing was 'de novo' and 'best interest.' "[4]

II

LEGAL DISCUSSION

A.  *The Trial Court Properly Made a De Novo Determination of Taylor's Best Interests.*

Niko argues the trial court erred by failing to follow the *Carney* rule, also known as the changed circumstance rule. (See *In re Marriage of Carney* (1979) 24 Cal.3d 725, 730 [157 Cal.Rptr. 383, 598 P.2d 36] *(Carney).)* We agree the *Carney* rule places the burden of proving changed circumstances on the parent seeking to change custody, and Foreman did not meet this burden. But reversal is not required here, because the court did not change custody. Although the court gave Foreman permission to relocate Taylor, the court continued joint custody with a modified coparenting arrangement. As we will explain anon, given the record it cannot be said the court abused its discretion.

■  When adult relationships go awry and the adults are unable to reach an agreement as to the custody of their offspring, courts must step in and determine what custody arrangement is in the best interest of the child. (§ 3087.) It is always a difficult task for a trial judge to make a custody determination, but the degree of difficulty increases significantly when one parent decides to move to a distant location and seeks to relocate the child.

---

[4] Although we do not conclude that "it was agreed at the start of trial that this hearing was 'de novo' and 'best interest,' " because we find a de novo hearing was proper we need not decide if such an agreement was reached.

■ The law is well settled as to how a court is to proceed when a parent with sole custody seeks to move away and take the child. In a sole custody case, the changed circumstance rule governs. The rule provides that a parent who is entitled under a final custody determination to sole physical custody of a child has a right to change the child's residence, subject to a court's power to preclude a removal that would prejudice the child's rights or welfare. (§ 7501, subd. (a).) In the sole custody situation, the custodial parent is not required to show the move away is imperative; rather, the objecting noncustodial parent must show that a change in custody is " ' "essential or expedient for the welfare of the child" ' " or, in other words, that the move would be detrimental to the child. (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 38 [51 Cal.Rptr.2d 444, 913 P.2d 473] (*Burgess*); see *LaMusga*, *supra*, 32 Cal.4th at p. 1098 ["[a] change in custody is 'essential or expedient' . . . if it is in the best interests of the child"].)

However, when the trial court is confronted with a joint custody move-away case, there are other considerations and different guidelines apply. As our Supreme Court has indicated, when parents share joint custody a different analysis from the one used in sole custody cases may be required. (*Burgess*, *supra*, 13 Cal.4th at p. 40, fn. 12, quoting § 3087.)[5]

We begin with the statute. In *joint* custody cases, section 3087 provides: "An order for joint custody may be modified or terminated upon the petition of one or both parents or on the court's own motion if it is shown that the best interest of the child requires modification or termination of the order." This statute relates to both the modification of a joint custody order as well as the termination of such an order. Only the former is relevant for our analysis.

■ When the parents have joint physical custody, modification of the coparenting arrangements is not a change of custody requiring change of circumstances. Instead, the trial court has wide discretion to choose a parenting plan that is in the best interest of the child. (*In re Marriage of Birnbaum* (1989) 211 Cal.App.3d 1508 [260 Cal.Rptr. 210].) The joint custody moving parent does not have the presumptive right to change the child's residence, and bears no burden of proving the move is essential or imperative. (*Burgess*, *supra*, 13 Cal.4th at pp. 38–39, fn. 10.) Nor does the

---

[5] The footnote states: "A different analysis may be required when parents *share* joint physical custody of the minor children under an existing order and in fact, and one parent seeks to relocate with the minor children. In such cases, the custody order 'may be modified or terminated upon the petition of one or both parents or on the court's own motion if it is shown that the best interest of the child requires modification or termination of the order.' (. . . § 3087.) The trial court must determine de novo what arrangement for primary custody is in the best interest of the minor children." (*Burgess*, *supra*, 13 Cal.4th at p. 40, fn. 12.)

opposing nonmoving parent bear the burden of showing substantial changed circumstances require a change in custody or that the move will be detrimental to the child.

The value in preserving an established custodial arrangement and maintaining stability in a child's life is obvious. But when the status quo is no longer viable and parents have joint custody, a court must review de novo the best interest of the child. It can fashion a new time-share arrangement for the parents. This is what the trial court did.

Here, the court was faced with a somewhat unique set of facts. Foreman requested permission to change Taylor's residence to Colorado and she sought a modification of the existing custody order from joint to her sole custody. Niko opposed the modification, and sought an order maintaining the status quo. He did not seek sole custody. We cannot conceive of a plan, and Niko proposes none, that would maintain the status quo with Foreman living in Colorado and Niko living in California. To maintain the status quo, the court would have been required to prohibit Foreman from moving and the court has no such authority. (*In re Marriage of Fingert* (1990) 221 Cal.App.3d 1575, 1581–1582 [271 Cal.Rptr. 389].)

In the trial court, Niko attempted to establish Foreman's move was unnecessary. We need not decide whether he was successful in that effort, because when a move-away dispute arises, a custodial parent seeking to relocate with the child bears no burden of establishing the move is " 'necessary.' " (*Burgess, supra*, 13 Cal.4th at p. 37.) When parents share joint custody the trial court need not question the wisdom of a parent's move or examine the reasons for the proposed move, but should certainly consider evidence of bad faith by the moving party if such exists. (*Id.* at p. 36; *LaMusga, supra*, 32 Cal.4th at p. 1100.)

On the issue of bad faith, Niko alleged Foreman sought to punish him for rejecting her and her real motivation for the move was to frustrate his relationship with his son. Niko provided evidence to support these assertions, but in the end the trial court was not persuaded. In its statement of decision, the court did not find Foreman's motives to be impure. All conflicts in the evidence are drawn in favor of the judgment. (*In re Marriage of Zimmerman* (1993) 16 Cal.App.4th 556, 561, 562 [20 Cal.Rptr.2d 132].) When supported by substantial evidence, we must defer to the trial court's findings. (*In re*

*Marriage of Schulze* (1997) 60 Cal.App.4th 519 [70 Cal.Rptr.2d 488].) "We may not reweigh the evidence or determine credibility. [Citation.]" (*In re Marriage of Friedman* (2002) 100 Cal.App.4th 65, 71 [122 Cal.Rptr.2d 412].) "Credibility is a matter within the trial court's discretion," and the reviewing court must defer to the trial court's findings on credibility issues. (*In re Marriage of Meegan* (1992) 11 Cal.App.4th 156, 162–163 [13 Cal.Rptr.2d 799].)

■   We acknowledge the court made the modification of custody effective upon Foreman's move to Colorado, but find no error in such an order. It is neither practical nor in the best interest of the child to require a parent to move first, and seek permission and modification after the fact. Therefore, the law allows a court to conduct a hearing based on the *intention* to move and make a custody order conditioned on the move being effectuated. Such a conditional modification order is not considered "an advisory opinion." (*Ruisi v. Thieriot* (1997) 53 Cal.App.4th 1197, 1206 [62 Cal.Rptr.2d 766].)

■   When Foreman decided to move to Colorado, she did what she was entitled to do under the stipulated custody agreement; she sought permission to change Taylor's residence. After a very lengthy hearing, and after having considered all of the evidence, the trial court made its decision. In continuing the joint custody order and modifying the coparenting arrangement, the court implicitly denied Foreman's request for sole custody. It is the court's ruling modifying the coparenting plan we review. An order modifying child custody or visitation is reviewed for abuse of discretion. (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255 [109 Cal.Rptr.2d 575, 27 P.3d 289].) "The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child." (*Burgess, supra*, 13 Cal.4th at p. 32.) After carefully reviewing the record, and the court's detailed ruling, it cannot be said the court abused its discretion in modifying the parenting plan.

B.   *Niko's Claims of Evidentiary Error Lack Merit.*

Niko asserts the court systematically suppressed all his evidence concerning Taylor's custody "preferences." He lists 12 rulings by the court which all relate to: (1) the court's decision it was not in Taylor's best interests to testify at trial; (2) problems with his expert (Smith); and (3) Niko's desire to have additional evidence admitted and experts testify. In short, we find no error.

■ We will begin by addressing the first contention concerning the court's decision Taylor should not be forced to testify in court. "Although a trial court is authorized to consider and give due weight to the wishes of a child who is of sufficient age and capacity so as to form an intelligent preference as to custody (§ 3042, subd. (a)), it need not call a child as a witness where the best interests of the child so dictate, and may instead provide alternative means of obtaining information regarding the child's preferences (*id.*, subd. (b))." (*In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 964, fn. 11 [38 Cal.Rptr.3d 610, 127 P.3d 28].)

As noted by the trial court on the record, it obtained information regarding Taylor's preference by appointing counsel to represent and interview the minor. (Accord, *In re Marriage of Brown & Yana, supra*, 37 Cal.4th at p. 964, fn. 11 [no error or abuse of discretion under § 3042 by appointment of counsel to obtain information on child's views].) Moreover, on its own motion, the court appointed an expert under Evidence Code section 730 to determine Taylor's best interest as it related to Foreman's request to move to Colorado. Bussey's report shows he asked Taylor many questions about his wishes and preferences, and the minor's responses were analyzed and conveyed to the court. Intent on protecting Taylor's best interests, the court obtained ample information regarding his preferences through alternative means.

■ Niko does not assert it was in Taylor's best interests to testify in court, rather Niko suggests he was entitled to his own expert evaluation of Taylor's preferences. But section 3042 does not support this theory, and Niko does not cite to any other legal authority to support his position. Section 3042 clearly authorizes *the court* to consider a child's preferences either by hearing the child's testimony as witness or by obtaining the information through alternative means.[6] Testimony about Taylor's preferences from the court-appointed expert and the court-appointed attorney properly satisfied the requirements of section 3042.

We recognize Niko had the right under Evidence Code section 733 to hire an expert to rebut the opinion of the court-appointed expert. Niko's first choice for a rebuttal expert was Smith. However, for reasons which are disputed, Smith ultimately recused himself from the matter. There is no evidence the court suppressed his testimony or otherwise precluded Niko from forcing Smith to testify by use of a proper subpoena. In fact, the court

---

[6] We wish to clarify that although the court has discretion to preclude the testimony of a child, a policy of never allowing a child to testify in a custody matter would be improper.

told Niko on several occasions Smith was welcome to testify as a percipient or expert witness. Instead, Niko chose Brown to be his Evidence Code section 733 witness.[7] Thus, contrary to Niko's argument, the record shows the court did not suppress *all* the evidence he had to offer concerning Taylor's custody preferences.

Niko is also highly critical of the court's refusal to allow Smith to reexamine Foreman and Taylor under Evidence Code section 733. In making its ruling, the court explained there was no need to have "two experts to render an opinion." It reminded counsel the purpose of an Evidence Code section 733 expert was to review and opine on the quality of the work product of the court's appointed expert.

Currently, there are no rules or cases clarifying the acceptable scope of review permitted by an Evidence Code section 733 expert. In some cases, it may be preferable to have the rebuttal expert conduct their own evaluation and testing in addition to reviewing and critiquing the existing reports, testing, and recommendations used in the Evidence Code section 730 evaluation. But in this case, we conclude the court properly recognized it would not be in Taylor's best interests to be subjected to additional questions and testing about the same sensitive subject matter. The predictable stress and anxiety caused by being examined by his father's paid expert would only be slightly less traumatic than being examined by father's counsel on the witness stand. It was well within the court's discretion to limit Niko's Evidence Code section 733 expert to review and critique of the existing clinical notes, tests, and reports produced during the Evidence Code section 730 evaluation. Niko had no statutory right to a second opinion on Taylor's preference, and he provides no legal authority to the contrary.

■ Niko also blames the court for Smith's ultimate decision to recuse himself from the case. He suggests the court had a proactive obligation to stop Foreman, her counsel, and minor's counsel from intimidating Smith or threatening to report him to the Board. But Niko does not suggest what exact measures the court should have taken. Other than moving to disqualify minor's counsel, Niko did not affirmatively request any other relief or sanctions from the court when the misconduct was allegedly occurring. And,

---

[7] Included in Niko's long list of erroneous court rulings, he included the court's decision to prohibit the testimony of two other possible Evidence Code section 733 experts, Warren Farrell and Alexander Caldwell. However, the merits of these rulings are not discussed at all in Niko's legal analysis section. We deem them waived. (*In re Marriage of Schroeder* (1987) 192 Cal.App.3d 1154, 1163–1164 [238 Cal.Rptr. 12].)

as for the disqualification motion, Niko fails to present any intelligible legal argument as to why the court's denial of the motion was reversible error. One cannot simply say the court erred, and leave it up to the appellate court to figure out why. (See *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545–546 [35 Cal.Rptr.2d 574] [appellate court need not furnish argument or search the record to ascertain whether there is support for appellant's contentions].)

The remainder of Niko's argument that the court denied *him* " 'alternative means of obtaining information regarding [Taylor's] preference' " is also without supporting legal or factual analysis. The one-page argument on the issue consists of six questions posed to this court about whether he had the right to collect information the way he desired from several sources. He concludes with the simple statement: "The father says, 'yes.' " "An appellate brief 'should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' [Citation.]" (*In re Marriage of Schroeder, supra,* 192 Cal.App.3d at p. 1164.) Again, "This court is not inclined to act as counsel for him or any appellant and furnish a legal argument as to how the trial court's rulings in this regard constituted an abuse of discretion" (*ibid.*), or a mistake of law.

### C. *The Motion to Dismiss Failed to Comply with the Procedural Rules.*

Niko poses the following question: "[W]hen father moved to dismiss, should the trial court have granted the motion? Father says, 'yes.' " He provides a lengthy discussion of why he believes the matter should have been dismissed. Noticeably missing from the analysis is any mention of when Niko made the motion or when the court ruled on it.

In family law cases, "[U]niform procedures apply to all motions and OSC's . . . whether the motion is filed by respondent at the initial responsive stage or by either party at a later stage. Family law motion/OSC procedures and forms are prescribed by [California Rules of Court, rule] 5.20, 5.21[.]" (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 1998) ¶ 4.75, p. 4-25.) In her respondent's brief, Foreman tells us Niko's request for a dismissal is contained on page 4 of his declaration attached to form 1285.40. However, "Motions made in response to the petition must be made on the FL-301 Notice of Motion Form." (*Id.* at ¶ 4:76, pp. 4-25 to 4-26.) Because the motion was not properly filed, a hearing date was not set for its consideration, and we find no indication the court specifically ruled on the matter. There is nothing for us to review.

D. *The Requests for Sanctions Failed to Comply with the Procedural Rules.*

Niko asserts the trial court erred in not awarding sanctions pursuant to sections 3027.1 and 271 based on Foreman's false allegations of abuse. The sanction request is contained within Niko's written closing argument that the court received on March 11, 2004. He complains the court did not rule on his requests within its statement of decision or final ruling. We conclude the court's decision to ignore the procedurally defective sanction requests was correct.

■ Niko was required to serve an OSC regarding section 3027.1 sanctions against Foreman at least 15 days before a scheduled hearing on the matter (§ 3027.1, subds. (a), (b).) Similarly, "[a]n award of fees and costs as a sanction pursuant to [section] 271 'shall be imposed only after *notice to the party against* whom the sanction is proposed to be imposed and *opportunity for that party to be heard.*' [Citations.] [¶] Consequently, [section] 271 . . . requests generally should be made by noticed motion (see [California Rules of Court, rule] 870.2); and, ordinarily, at the end of the litigation . . . when the 'extent and severity of the party's bad conduct can be judged[.]' " (Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 14:265, p. 14-63.)

Here, the court asked the parties to submit seven pages of written closing arguments on the same day (March 11), and also personally deliver copies to the other parties that day. It added, the parties could submit income and expense declarations as well as any fee declarations. Niko failed to indicate he desired a hearing on sanctions and he knew neither party had the time or opportunity to respond to points raised by their opponent in the written closing argument.

Consequently, Niko's request for sanctions in his closing argument not only failed to comply with the well-established procedural rules, it also denied Foreman her due process right to respond or be heard on the matter. It should have come as no surprise when the court failed to award sanctions.

The record shows that when Niko received the court's tentative statement of decision, he requested that certain additions be made. But, he failed to mention the court's purported failure to rule on the sanction requests. Alternatively, at this time, Niko could have filed a properly noticed motion seeking sanctions, but he did not. It appears Niko abandoned his sanction requests below, and he cannot now be allowed to revive them on appeal. As a reviewing court, we cannot consider these trial-based sanction requests in the first instance.

## III

### DISPOSITION

The order is affirmed. Respondent shall recover her costs on appeal.

Ikola, J., concurred.

**BEDSWORTH, Acting P. J.,** Dissenting.—I agree with my colleagues on the sanctions issue, but cannot agree with that portion of the majority opinion which rejects Niko's challenge to the move-away order in this case. I must, therefore, respectfully dissent.

There are few concepts in the law as vital—as sacrosanct—as the finality of judgments. It is not hyperbole to say that assuring litigants of the finality of judgments is a sine qua non of an effective system of civil justice. At a time when both the Statue of Liberty and Coca-Cola were new, and neither basketball nor motion pictures had yet made an appearance, California courts were holding that "there must be an end of litigation; and when parties have once submitted a matter . . . it must be regarded as final and conclusive, unless it can be shown that [something] has prevented a fair submission of the controversy." (*Pico v. Cohn* (1891) 91 Cal. 129, 133 [25 P. 970].) We have considered it so important that we have upheld it even when the judgment has been procured by perjured testimony, false evidence, or intrinsic fraud. " '[P]ublic policy requires that only in exceptional circumstances should the consequences of res judicata be denied to a valid judgment.' [Citation.]" (*Kulchar v. Kulchar* (1969) 1 Cal.3d 467, 470 [82 Cal.Rptr. 489, 462 P.2d 17].) "Furthermore, inasmuch as losing parties have strong inducement to contrive attractive reasons why a controversy should be reopened, the rules concerning relief from a judgment are properly cast in narrow terms." (Rest.2d Judgments, § 70, com. a, p. 180.)

Family law litigants have as much right to rely on this finality as anyone else. Indeed, given the paramount interest of the law in promoting stability for the sake of children involved in such judgments, this may be the area of the law that most cries out for zealous protection of finality. (See *Lassiter v. Department of Social Services* (1981) 452 U.S. 18, 32, fn. 20 [68 L.Ed.2d 640, 101 S.Ct. 2153]; *Lehman v. Lycoming County Children's Services* (1982) 458 U.S. 502, 513 [73 L.Ed.2d 928, 102 S.Ct. 3231].) "The State's interest in finality is unusually strong in child-custody disputes." (*Lehman,* at p. 513.) " 'It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or [foster parents]. There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current "home," . . . especially when such uncertainty is

prolonged.' [Citation.]" (*In re Sade C.* (1996) 13 Cal.4th 952, 988 [55 Cal.Rptr.2d 771, 920 P.2d 716].) "To permit a parent to raise issues which go to the validity of a final earlier appealable order would directly undermine these dominant concerns of finality and reasonable expedition." (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1152 [65 Cal.Rptr.2d 913].) So once a family law court determines what is in the best interests of the children, that conclusion should be adamantine unless and until there is a significant change.

And, in fact, that is the law. A host of cases have developed what we call the "changed circumstance" rule, which protects all involved against the vagaries of inconsistent judgments by seriatim judges. As explained in *Burchard v. Garay* (1986) 42 Cal.3d 531, 535 [229 Cal.Rptr. 800, 724 P.2d 486], "It provides, in essence, that once it has been established that a particular custodial arrangement is in the best interests of the child, the court need not reexamine that question. Instead, it should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest."

But my colleagues, perhaps misled by a footnote, have today retreated significantly from defense of that position. They have decided that footnote 12 of *In re Marriage of Burgess* (1996) 13 Cal.4th 25 [51 Cal.Rptr.2d 444, 913 P.2d 473], was the Supreme Court's announcement that it had surrendered the concept of finality of judgments in the area of family law. They interpret it to mean the Supreme Court is prepared to allow modifications of custody whenever a parent changes his or her mind about what he or she wants, and can convince a new judge to weigh the interests of the child differently than the last one did. I find this hard to reconcile with the rest of *Burgess,* which seems rather clearly to reinforce the importance of finality in custody judgments. But they have held that when a parent with joint physical custody changes her mind about where she would prefer to live, finality of judgments no longer obtains; the family law court must start over and reassess the best interests of the child from scratch—and it must do so without regard to the earlier court's determination in that regard or the agreement bargained for by the other parent that the child would be raised in California. They do so by concluding that a thousand-mile move is not a change in physical custody, but merely some kind of "modification of the coparenting arrangements." (Maj. opn., *ante,* at pp. 363, 365.) In essence, they've said something akin to: "Your pet is still a golden retriever, only now instead of orange fur, big floppy ears and a long tail, it has silver scales, fins and gills and isn't quite as huggable."

I am not yet willing to throw in the towel on something as important as finality of judgments, and would not allow what I believe is a reassessment of

a final custody judgment in this case, absent a showing of significant changed circumstances. If the Supreme Court meant footnote 12 to effect a revolution in the area of child custody modification, they were too subtle for me; if they meant it only to clarify their holding in *Burgess*, they were too subtle for my colleagues. Either way, we could use a little help in this area.

I am further unconvinced this parent received a fair hearing below. The court refused to hear from the very mature 12-year-old child whose custody—and state of residence—were at issue because of a personal "policy" against listening to the children. It did so despite knowing that the father's only expert had been intimidated from testifying, an action my colleagues ratify with the explanation that, "[t]here is no evidence *the court* suppressed his testimony or otherwise precluded Niko from forcing Smith to testify by use of a proper subpoena." (Maj. opn., *ante*, at p. 366, italics added.) To my mind, a trial court should at least *inquire* when there is evidence an attorney *admittedly* intimidated a witness who intended to testify for an opposing party; it is not enough for the court to just throw up its hands and say, "Not my problem." My colleagues are willing to accept that; I am not.

Here—in précis form for those not enamored of long, detail-laden dissents—is what I say at some length, *post*: A court should not change a final custody judgment by reweighing the best interests of a child until it has been proven that circumstances have changed. Moving a child to Colorado with one parent after a final custody judgment said he should be raised in California by both parents *is* a change in that judgment. "I have changed my mind about what I want for myself and my child," *is not* a change of circumstances. The trial court was therefore wrong, and it will be hugely counterproductive to countenance such rulings because they will undermine the stability so necessary to the system and the families it serves.

I

As the majority seems to acknowledge, Niko and Foreman have a history together which is byzantine in its complexity. Although never married, their romantic relationship both predated Niko's marriage to his current wife, Elizabeth, and has continued off and on throughout much of that marriage. Niko initially filed his petition to establish paternity of Taylor in September of 1996, but the dispute apparently lay dormant for some period of time; Foreman did not answer the petition until 1998, at which time she requested "primary" physical custody of Taylor, as well as an award of child support.

Niko requested the appointment of a custody evaluator, offering to pay the entire cost. In support of that request, Niko stated under penalty of perjury that Foreman had threatened to move away to Colorado with Taylor unless he

divorced his wife Elizabeth and married her. In April or May of 1998, the parties stipulated to the appointment of custody evaluator Stephen Adam, Ph.D. However, it appears they also reconciled for a brief period around that time, and the evaluation was put off. After Niko and Foreman again broke up, the court entered an order directing Adam to proceed with his evaluation.

In December of 1998, Niko sought the appointment of a second custody evaluator, on the ground that Foreman had been threatening, over a period of years, to "relocate to Colorado with [Taylor] if the three of us were not going to be a family." Niko stated that Adam, the initial custody evaluator, had indicated he would not address that issue in his evaluation. In response to the request, Foreman declared, under penalty of perjury, "I have *no* intention, now or in the future, of relocating to Colorado." She explained "this is where my son is attending school and doing very well. I have no intention of disrupting his life and move [*sic*] him out of state." Over Foreman's objection, the court granted the motion, and appointed the second custody evaluator at Niko's expense.

Adam produced his written report in February of 1999.[1] The report noted that during the course of his initial evaluation, the parties appeared to be on the verge of stipulating to a custody arrangement which apparently would have given Foreman the majority of custodial time. But then Niko's counsel reported to Adam that Foreman had threatened to move to Colorado. In light of that possibility, Niko would not stipulate to any arrangement giving him less than 50 percent custody of Taylor. Adam also reported, however, that Foreman had "denied that she ever had any intention of moving, or that she had any plans of relocating." She had told Adam "there was no basis for Mr. Niko's statement regarding the potential for her to relocate to the state of Colorado." Adam reported that he consequently did not consider the issue "a significant matter," and acknowledged he had informed the parties he would not address it in his report.

Adam's report did include an assessment of Foreman, Niko and Niko's wife, Elizabeth. It reflected that all parties were attempting to grapple, as best

---

[1] The extent to which the court considered Adam's report in connection with its ultimate order modifying custody is unclear. The report was part of the court's file (and is included in our record on appeal). Dr. Bussey, the court-appointed custody evaluator who testified at the hearing on Forman's move-away hearing, discussed Adam's report in both his own written report and in his testimony. Moreover, the court was formally requested to take judicial notice of its entire file at the conclusion of the custody modification hearing.

In any event, as mentioned below, my discussion of the report is solely for background purposes. It provides the only significant context for the determination of whether the parties' stipulated judgment was intended to resolve the issue of Foreman's alleged desire (which she denied) to move with Taylor to Colorado. I believe it was, and in the absence of some change in circumstances, such a resolution should have stuck.

they could, with a fairly messy situation. All seemed to agree Niko has been torn between "his commitment to his son vs. his marriage vow." Adam concluded Foreman and Niko "have been ineffective in their efforts to define the terms of their personal relationship." The inconsistency in their personal interactions has been difficult for Taylor. Adam noted that both Foreman and Niko were good parents, although with markedly different parenting styles. He felt that a parenting class might help both parents to formulate a more consistent parenting style. Adam recommended that Taylor continue under the same custody arrangement already in place, which he defined as joint legal custody, but with primary physical custody to Foreman. He noted that Taylor had been "flourishing," and Foreman had never frustrated Niko's access to him. Adam saw no reason to alter the status quo.

The second evaluator, Donald Smith, Ph.D., produced a written report in May of 1999. Its purpose was to rebut the report offered by Adam, and to evaluate Foreman's potential "move away" to Colorado. However, Smith also noted that Foreman also denied any intention of moving to him, stating, "No, I have no plans to move to Colorado." He thus stated, "it appears Mr. Niko's concern regarding a 'move away' issue with Ms. Foreman may be something of a misunderstanding. Ms. Foreman stated she has never planned to move to Colorado . . . never."

I relate all of this because it was against this background, including substantial disputes about whether Foreman would move to Colorado with the parties' son, Taylor, that the parties stipulated to their custody judgment. They agreed, and the court ordered, that it would be in Taylor's best interest that the parties have *equal* physical custody, and coparent him in California. So this was an agreement—and a judgment—borne of heated and protracted negotiation. It took *years* for the parties to arrive at this point. There can be little doubt Niko thought—and I think quite reasonably—that the stipulated custody judgment foreclosed Foreman's simply changing her mind and deciding to go live in Colorado without having to show a change in circumstances. It certainly should have.

The parties' stipulated judgment has the same force as a judgment entered after a contested trial (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 257–258 [109 Cal.Rptr.2d 575, 27 P.3d 289]), and consequently cannot be altered *absent a change of circumstances*. "The changed-circumstance rule . . . provides, in essence, that once it has been established that a particular custodial arrangement is in the best interests of the child, the court need not reexamine that question. Instead, it should preserve the established mode of custody *unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest*. The rule thus fosters the dual goals of judicial economy and *protecting stable custody arrangements*." (*Burchard v. Garay, supra*, 42 Cal.3d at p. 535, italics added.)

The Supreme Court had earlier applied the "changed circumstances" rule in *In re Marriage of Carney* (1979) 24 Cal.3d 725 [157 Cal.Rptr. 383, 598 P.2d 36], explaining: "[the] change must be substantial: a child will not be removed from the prior custody of one parent and given to the other 'unless the material facts and circumstances occurring subsequently are of a kind to render it essential or expedient for the welfare of the child that there be a change.' [Citation.] The reasons for the rule are clear: 'It is well established that the courts are reluctant to order a change of custody and will not do so except for imperative reasons; that it is desirable that there be an end of litigation and undesirable to change the child's established mode of living.' [Citation.] [¶] Moreover, although a request for a change of custody is also addressed in the first instance to the sound discretion of the trial judge, he must exercise that discretion in light of the important policy considerations just mentioned. For this reason appellate courts have been less reluctant to find an abuse of discretion when custody is changed than when it is originally awarded, and reversals of such orders have not been uncommon." (*Id.* at pp. 730–731, fn. omitted.)

The primacy of the policy favoring stability was reiterated in *In re Marriage of Burgess, supra,* 13 Cal.4th at pages 32–33, "As we have repeatedly emphasized, the paramount need for continuity and stability in custody arrangements—*and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker*—weigh heavily in favor of maintaining ongoing custody arrangements." (Italics added.)

In *Burgess,* the court held that when a parent has been awarded sole physical custody, he or she has a presumptive right to move with the children, and the burden is on the noncustodial parent to demonstrate "changed circumstances"—not merely consisting of the fact of the move itself—which demonstrate that a change in custody is necessary to prevent detriment to the children. "[A] parent seeking to relocate does not bear a burden of establishing that the move is 'necessary' as a condition of custody. Similarly, after a judicial custody order is in place, a custodial parent seeking to relocate bears no burden of establishing that it is 'necessary' to do so. Instead, he or she 'has the right to change the residence of the child, subject to the power of the court to restrain a removal that would prejudice the rights or welfare of the child.' (Fam. Code, § 7501.)" (*In re Marriage of Burgess, supra,* 13 Cal.4th at pp. 28–29.)

As the Supreme Court also explained in *Burgess,* while a parent with *sole* custody has the presumptive right to change the residence of the child subject only to the power of the court to restrain a removal that would prejudice the child's interests, that same rule may not be applied to a *joint* custody situation. The court suggested that in such a case, "the custody order 'may be

modified or terminated upon the petition of one or both parents or on the court's own motion *if it is shown that the best interest of the child requires modification or termination of the order.*' (Fam. Code, § 3087.) The trial court must determine de novo what arrangement for primary custody is in the best interest of the minor children." (*In re Marriage of Burgess, supra,* 13 Cal.4th at p. 40, fn. 12, italics added.)

As this passage suggests, the order allowing a parent who merely *shares* custody to move away with the child, thus disrupting the existing custody arrangement, would require more of a showing than a change of location for a parent with sole custody. Thus, in the shared custody situation, the court should consider making a new order only "if it is shown that the best interest of the child *requires modification* . . . of the [prior] order." (*In re Marriage of Burgess, supra,* 13 Cal.4th at p. 40, fn. 12, italics added.) And since the best interest of the child has already been determined once, a change in that determination, like a change in any other final decision, would require a showing that some significant circumstance has changed, thus requiring a modification. Only if that hurdle is crossed, do I think we get to a de novo determination of what primary custody arrangement would then be in the child's best interest.[2]

---

[2] I recognize that there are at least two decisions that seem, at first glance, to interpret footnote 12 in *Burgess* as though a de novo determination were automatic when a parent with joint custody states an intention to move. They seem to say that when parents enjoy a true "joint custody" relationship with their children, and one parent decides to relocate a significant distance away, the mere fact of that relocation constitutes a "changed circumstance" sufficient to trigger a de novo review. (*Brody v. Kroll* (1996) 45 Cal.App.4th 1732 [53 Cal.Rptr.2d 280]; *In re Marriage of Williams* (2001) 88 Cal.App.4th 808 [105 Cal.Rptr.2d 923].) But when closely read, those cases are distinguishable, and this case would not constitute a showing of changed circumstances as understood there.

Neither party in this case addressed *Williams* or *Brody*. I assume that was because, while facially similar to ours, both are cases where the appellate courts essentially found that circumstances *had* changed, without expressly saying so. In *Williams*, Mom had already moved to Utah and taken two of her children with her. Faced with a fait accompli of radically changed circumstances, the court dealt only with the best interests of the child and the appellate court upheld its ruling. In *Brody*, Mom had lost her job, and been forced onto welfare rolls. When she was offered a job in Connecticut, she took it and was all but driving the moving van toward the border when she was stopped by the trial court. Again the trial court went straight to the issue of what was best for the child.

Neither case dealt with changed circumstances because in neither case was there any issue about whether there had been a change. Here, on the other hand, that is a huge issue—one the trial court did not address, and which is the key to our determination it erred. But I mention *Williams* and *Brody* not to set fire to strawmen, but to make clear that my research even into areas not raised by the parties, has disclosed no cases that would support a change of custody without a showing of some actual changed circumstance. To allow a modification of an existing custody order as far-reaching as that sought in this case based not on a change of circumstances but a change of mind, would render the stability promised by final custody orders wholly illusory.

In this case, by contrast to the petitioning mother in *Burgess*, Foreman did not enjoy sole custody of Taylor. The parties' judgment provided for joint custody, both legal and physical. Consequently, Foreman was not entitled to any presumption under Family Code section 7501, favoring her right to move with Taylor. Instead, as it was Foreman who was seeking to fundamentally alter the existing custody judgment, it was her burden to demonstrate sufficient circumstances to warrant the change she sought.

Had Foreman shown significant changed circumstances affecting either her own living or working situation, or suggesting that Taylor's current custody situation was no longer appropriate, then a de novo test would have been applied to determine what would be in the best interest of the child under the circumstances. Rather than imposing this burden on her, however, the trial court expressly eschewed any such requirement, acknowledged Foreman had not even *argued* such a change, yet somehow concluded she was simply entitled to a de novo review of the custody issue, because she had decided she would rather live in Colorado. In my view, that was error.

My colleagues choose to sidestep this error by simply concluding that the trial court did not *technically* alter the joint custody judgment when it gave Foreman permission to move a thousand miles away with Taylor. Citing *Montenegro v. Diaz, supra*, 26 Cal.4th at page 255, the majority conclude the court here "implicitly" (maj. opn., *ante*, at p. 365) maintained joint physical *custody*, while altering only the "coparenting arrangement." However, the decision in *Montenegro*, allowing a modification of prior child-custody orders without any change in circumstances, has nothing to do with some distinction between the concepts of "custody" and "coparenting." *Montenegro* was *expressly* based upon a determination that the prior stipulated custody orders *were not intended to be final judgments*: "[W]e hold that a stipulated custody order is a final judicial custody determination for purposes of the changed circumstance rule only if there is a clear, affirmative indication the parties intended such a result. . . . [¶] [W]e conclude that neither the June 24, 1997 order nor the September 30, 1996 order constitutes a final judicial custody determination. Although these orders included detailed visitation schedules and did not provide for further hearings, *they did not clearly state that they were final judgments as to custody*." (26 Cal.4th at pp. 258–259, italics added.)

In the instant case, by contrast, the final custody judgment *did* clearly identify itself as such. It not only was a final judgment; it said it was a final judgment. And it was a final judgment arrived at through hugely difficult and doubtless hugely costly—both emotionally and fiscally—negotiations. To discard such a judgment without requiring changed circumstances is not only to blink at the code, but to turn the court that supervised those negotiations into Sisyphus.

There are cases establishing that when a party seeks to alter visitation schedules, but not custody, no "changed circumstances" need be shown. (See *Enrique M. v. Angelina V.* (2004) 121 Cal.App.4th 1371 [18 Cal.Rptr.3d 306]; *In re Marriage of Birnbaum* (1989) 211 Cal.App.3d 1508 [260 Cal.Rptr. 210].) But this is not a situation in which the court was faced with deciding whether the children should sleep at Mom's house rather than Dad's on Tuesdays, or whether Dad's time should be bumped up from alternating weekends to every Saturday so as to accommodate the child's soccer schedule. It is one in which the child's *residence* was to be moved not only outside the State of California, but a thousand miles away. It is one in which the custody situation was fundamentally changed from one in which both parents had the "frequent, and continuing contact," defined by the Family Code as the hallmark of "joint custody,"[3] to something that could not—with a decent respect for language—be described as giving Niko *either* of those things. Unless we count phone calls, standing alone, as sufficient contact to qualify as "custody," or unless Niko owns a private jet, there is simply no way he can maintain "frequent and continuing contact" with a child who lives a thousand miles away.[4]

In my view, the court clearly *did* modify the prior joint custody judgment. Its current order could be fairly described as either (1) implicitly giving sole physical custody to Foreman, with substantial visitation time to Niko during Taylor's school vacations; or (2) implicitly giving the parties alternating periods of sole custody—Foreman during the school year and Niko during vacations. At no time, however, is that physical custody "joint."

I would conclude a parent sharing joint custody must make an initial showing of changed circumstances affecting the custody arrangement, before the right to a de novo hearing is triggered. That showing could consist of external circumstances, such as changed financial circumstances, a new and different job opportunity, remarriage, etc., which have affected the parent's choice of residence. Or it might be satisfied by the evidence showing that the parent unequivocally *intends* to move, without regard to the outcome of the hearing. As I have already noted, the *fact* of a distant relocation, in and of itself, will likely render a joint custody arrangement impracticable, and would

---

[3] Family Code section 3004 states: " 'Joint physical custody' means that each of the parents shall have significant periods of physical custody. *Joint physical custody shall be shared by the parents in such a way so as to assure a child of frequent and continuing contact with both parents*, subject to Sections 3011 and 3020." (Italics added.)

[4] And, of course, if mere phone contact alone were sufficient to constitute the "frequent and continuing contact" required for "joint physical custody," there would be no such thing as "sole custody." Any order—save one that allowed a parent to move the child to a cold water cabin in the Sawtooth Mountains, out of reach of telephones or the Internet—would be a "joint custody" order.

consequently obligate the court to reassess. The party seeking the modification might also satisfy the burden by evidence demonstrating that the current arrangement is, for some other reason, detrimental to the child. But the mere *desire* of one parent to sever a *successful* joint custody arrangement and move away with the child, without any substantial change in circumstances, and without any indication the parent actually intends to move in the absence of court approval, is not sufficient. And that is all the court required in this case.

Moreover, in my view, the court compounded its error by apparently placing the burden on Niko to actually prove the modification sought by Foreman would be detrimental to Taylor. In its statement of decision, the court expressly found that if Niko's case was intended to demonstrate "that it's not in this child's best interest to move, *then he has not met his burden.*" (Italics added.) At another point, the court also dismissed Niko's contentions regarding the potential detriment that Taylor's relocation might have on his current family relationships with a statement suggesting it had determined he failed to carry his burden of proof as to that issue: "Taylor can continue to maintain and build his bond with his dad, step mom and new sister during his long visits. Will it be different? Yes. Will it be harmful? Insufficient evidence. Will it be detrimental to his best interests? Insufficient evidence."

I cannot emphasize too strongly that this was not a case like *Burgess*, in which a mother, who already had sole custody, possessed the presumptive right to move. In this case (as the trial court actually acknowledged), Foreman was entitled to no presumption. As the party seeking the modification, the burden of proof was entirely hers. The trial court's rather cavalier dismissal of the questions of harm and detriment to Taylor with the unexplained response, "[i]nsufficient evidence" makes it painfully clear the court placed the burden of proof on the wrong party.

And this is also a case in which the burden may have been critical to the outcome. To be sure, Foreman's initial pleading stated sound, even compelling justifications for her decision to relocate with Taylor to Colorado. She asserted she could no longer afford to live in Southern California, and she expressed concern that Niko was subjecting Taylor to abuse. She also suggested that Taylor had been missing his extended family since they moved to Colorado six years earlier, and wished to live closer to them. Had Foreman established either of the first two justifications at the hearing—and had the trial court applied the correct standard and determined she was acting in good faith—she might have been entitled to a change in custody entitling her to move away with Taylor. But Foreman expressly abandoned the first two justifications at the commencement of the hearing, leaving only the desire to live closer to those family members who resided in Colorado.

And as to that desire to be closer to family, the court's custody evaluator viewed it as primarily Foreman's, rather than Taylor's. Foreman herself openly acknowledged that her desire to move to Colorado was not new. Notwithstanding her numerous denials throughout the course of this case, she conceded at the hearing that she had been seriously considering it for approximately six years, since long before the custody judgment was entered. So that desire *did not* constitute a changed circumstance, much less a significant one. Indeed the scant evidence in this case brings to mind Justice Baxter's admonition in *Burgess*: "Even if the relocation is not a conscious effort to frustrate parent-child contact, casual motives for moving may indicate the relocating parent's lack of commitment to the child's interest in a continuing bond with both parents. The court may and should take that into account when deciding whether a consequent change in the award is justified." (*In re Marriage of Burgess, supra*, 13 Cal.4th at p. 44 (con. & dis. opn. of Baxter, J.).)

Finally, I would note there was no evidence Foreman had any intention of moving if the court declined to grant her a modification; to the contrary, the only evidence on that issue was that she had affirmatively stated she would *not move* unless the court granted permission for Taylor to relocate as well. Under these circumstances, Foreman failed to show that a modification of the existing judgment was prompted by any significant change in circumstances since the judgment had been entered. Nor did she demonstrate that it would be in Taylor's best interests for him to relocate with her alone to Colorado, rather than remain in Southern California and retain day-to-day contact with both parents. To the contrary—the undisputed evidence was that he was doing spectacularly well under the arrangement already in place, and there was no showing that Colorado would be an actual improvement.

Consequently, it seems to me that what Foreman sought to do in this case was turn the "changed circumstances" rule on its ear: Without even attempting to establish that the current arrangement was either no longer practicable or no longer beneficial, she obtained a hearing, in which the court determined, de novo, which of two fairly radical modifications of the custody judgment would be better; either Taylor would live solely with her in Colorado, or solely with Niko in Southern California. Armed with a ruling in her favor on that issue, Foreman was then free to effect the changed circumstance she preferred. In light of the strong policy favoring the stability of custody arrangements, I cannot endorse that approach.

## II

Having concluded the court applied the wrong standard in this case, I also reject Foreman's (and the court's) contention that Niko somehow waived

application of the correct standard by agreeing to the one the court relied upon. While the record demonstrates the court did solicit such an agreement, and both Foreman and Taylor's appointed counsel gave it, Niko did not. Instead, he argued the significance of maintaining stability in a custody arrangement, and specifically cited the *"Carney* rule"—clearly referring to the "changed circumstances" rule set forth in *In re Marriage of Carney, supra*, 24 Cal.3d 725.

Although the colloquy between the court and Niko's counsel on the point was not as clear as one might hope, that can be explained in part by the fact that at the time of the discussion, Foreman was expected to offer evidence in support of what she had initially claimed were her justifications for the move away. Had she done so, and had the court then concluded that her proof was sufficient to constitute changed circumstances justifying a modification, it would have been appropriate for the court to consider the terms of that modification on a de novo basis. But that never happened. Moreover, the court cut Niko's counsel short when he tried to explain his position. Any lack of clarity cannot, as a consequence, be blamed on him.

But, as already noted, Foreman actually abandoned her claimed justifications in fairly short order. Moreover, any doubts about Niko's intentions regarding the proper standard to be applied were cleared up when he filed his posthearing brief in support of requested additional findings. That brief, which was filed before the court had made any express findings about the standard, argued forcefully, and at some length, for application of the "changed circumstances rule." The court's subsequent minute order, reflecting its conclusion that Niko had agreed to a different standard, was simply incorrect.

## III

Having concluded that the court erred in excusing Foreman from any showing of changed circumstances, I would reverse the order allowing her to move with Taylor to Colorado on that basis alone. However, in my view the court committed other significant errors as well. First, the court's statement of decision reveals an express refusal to consider Niko's evidence suggesting Foreman had an established pattern of using Taylor—and specifically of threatening to take him with her to live in Colorado—as a weapon to manipulate Niko.

The court characterized this evidence as "irrelevant" to the issue of Taylor's best interests *"now,"* and expressly refused to make any finding as to whether such past conduct had occurred. It also suggested that Niko's concerns regarding the motivations behind Foreman's decision to move were a

complete mystery: "For no reasons this court can discern, he is fearful that if [Foreman] leaves, she will keep Taylor from him. If history is the greatest predictor of the future, then the facts do not bear this out." The court even went so far as to lament that it was "not sure what case it is that dad and his attorney were presenting . . . ."

What case Niko was presenting is very clear to me. If believed, his evidence would clearly be sufficient to support the conclusion that Foreman's decision to take Taylor away to Colorado was part of an established pattern of bad faith conduct; indeed, it was arguably the culmination of a long-term campaign of threats to Niko's access to Taylor, waged as a means of manipulating him. In my view, the record is fairly clear that Niko had been, for a long time, torn between his desire to be a full-time father to Taylor, and his commitment to his marriage, and that Foreman kept herself available in the event he might choose Taylor. Thus, it could be concluded that Taylor was Foreman's chief weapon in what appeared to be a contest for Niko's affections. Indeed, Foreman herself admitted that on one occasion, in the heat of an argument, she had taunted Elizabeth with the fact she had been unable to have any children, and suggested that Niko could never be happy with her, as he desired to have more children.

When Elizabeth became pregnant with her own child then, it would appear the situation changed markedly. Foreman no longer enjoyed the advantage of being the only woman who could give Niko a child, and she arguably recognized that her chance of ultimately winning Niko was gone. So she decided to leave, taking Taylor with her. This scenario is plausible and even supported by other evidence. In fact, Bussey, the custody evaluator whose opinions the court found so credible, characterized Elizabeth's pregnancy, and the ultimate demise of Foreman's own relationship with Niko, as a *"central factor" in Foreman's decision to relocate.*[5] (Italics added.)

And of course, Niko's theory casts in a new light the evidence the trial court found so persuasive in concluding that the move would not likely interfere with the relationship between Niko and Taylor. As the court explained, the fact that Foreman had always been supportive of the relationship suggested there was no reason to be concerned that she would not continue to do so in Colorado. But if the court had considered the evidence proffered by Niko, it might have been persuaded that Foreman's past support of the father/son relationship was merely an element of her continuing plan to convince Niko to return to her and Taylor, and be a family. Once she realized

---

[5] Moreover, the very fact that Foreman suggested Niko might be abusing Taylor, as stated in her petition, certainly undermines the inference that she was still a booster of the father/son relationship.

that was not to be, it is perfectly plausible that she might consequently have lost her enthusiasm for promoting that father/son bond.

It would also be reasonable to infer that Foreman's desire to take Taylor away to Colorado reflected a new resolve—an intent *to establish a separation* between herself and Taylor, as one family, and Niko and Elizabeth and their new daughter, as another. That goal, of creating a separation, would certainly amount to "frustrating" Niko's ability to maintain his relationship with Taylor—and would have precluded a modification order allowing Foreman to carry out her relocation plan.

In this regard, the Supreme Court's recent decision in *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072 [12 Cal.Rptr.3d 356, 88 P.3d 81], is instructive. In that case, even though the mother had physical custody of the children, and had a good faith reason for her decision to move, the court nonetheless denied her petition to move away with the children. The court explained that "[a]bsolute concepts of good faith versus bad faith often are difficult to apply because human beings may act for a complex variety of sometimes conflicting motives." Thus, "[e]ven if the custodial parent has legitimate reasons for the proposed change in the child's residence and is not acting simply to frustrate the noncustodial parent's contact with the child, the court *still may consider whether one reason for the move is to lessen the child's contact with the noncustodial parent* and whether that indicates, when considered in light of all the relevant factors, that a change in custody would be in the child's best interests." (*Id.* at p. 1100, fn. omitted, italics added.)

In short, a parent's decision to relocate with children, far away from the other parent, is generally the product of complex motivations. The labyrinthine circumstances of this case can only exacerbate that complexity. The fact that Foreman has some legitimate basis for selecting Colorado as a new place to live in no way forecloses the possibility that she is *also* intent on separating herself and Taylor from Niko. And where her decision coincides with a significant change in the relationship between herself and Niko, as appears may be the case, Foreman's past history of facilitating visitation may not be a strong predictor of future conduct.

I do not mean to suggest that I necessarily believe Niko's theory; its ultimate credibility is a determination that should have been made by the trial court. I only mean to suggest that the court was obligated to grapple with this messy evidence and address these complex issues; it could not simply reject Niko's contention that Foreman's motivations for moving were "impure." By setting out Niko's theory at some length, I do not mean to endorse it, but merely to demonstrate how highly relevant some of the excluded evidence could be.

## IV

I also conclude Niko is correct in his assertion that the court abused its discretion in refusing to either hear from Taylor directly about his preferences and the reasons therefor, or providing a sufficient "alternative means of obtaining information regarding the child's preferences." (Fam. Code, § 3042, subd. (b).)

Family Code section 3042, subdivision (a) expressly requires that, "If a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody, the court shall consider and give due weight to the wishes of the child in making an order granting or modifying custody." The court clearly did in this case, and in fact emphasized the significance of Taylor's wishes in reaching its decision. However, what the court refused to do was admit any *direct evidence* of those wishes.

To be sure, everyone had an opinion about what Taylor wanted, and what reasons might have prompted his preference, but those opinions varied widely. Moreover, Niko proffered evidence that his own custody evaluator, Smith, had reached a significantly different conclusion than had Bussey. He also proffered evidence that Smith had been dissuaded from testifying because of threats made by Foreman and by Taylor's appointed counsel.[6] He asked the court for some relief from the prejudice he suffered as a result of that consequence.

Unfortunately, the court appeared to consider the evidence that Smith had been, in effect, "run off" to be irrelevant. I strongly disagree. Even if I assume that Foreman had an absolute right to file a complaint against Smith with the Board of Psychology (and she may well have), or that Taylor's counsel, LaFlamme, had acted properly in taking Smith aside and suggesting that *if he testified* a complaint would be pursued (a far more doubtful proposition[7]), I could not conclude that the *consequences* of those actions are immaterial. Even justified conduct has consequences, and the court could not simply discount them on the basis that they were not the product of wrongdoing.

---

[6] Taylor's appointed counsel, Harold LaFlamme, admitted he had told Niko's expert, Smith, in a "private conversation" that he was "concerned that *should [Smith] testify in the hearing*, he would be the recipient of yet another complaint to the Board of Psychology." (Italics added.) While LaFlamme took great pains to specify that he did not actually threaten to file the complaint *personally*, that distinction is irrelevant. The consequences of testifying were nonetheless made quite clear to Smith.

[7] An attorney who feels a witness has acted improperly should confront him with it on cross-examination and/or report him to the proper authorities—not strong-arm him.

It is undisputed that the pressure applied by Foreman and LaFlamme *actually caused* Smith to withdraw from the case. Niko himself did nothing to cause it. It is also undisputed that had Smith remained on the case, the court would have heard his testimony regarding Taylor's preferences. Consequently, as a direct result of Foreman's and LaFlamme's conduct, and through no fault of his own, Niko lost the ability to offer evidence from the only witness who could counter Bussey on the subject of Taylor's preferences. In a case in which the facts were in such dispute, that loss was significant.

Moreover, it appears the court's refusal to hear from Taylor directly was not the product of discretion, but of personal policy. As the court explained, it harbored a general conviction that it was not in a child's best interest to participate directly in a custody dispute. It indicated it had *never actually allowed a child to testify, and had interviewed a child in chambers only twice*. It apparently considered the appointment of a child custody evaluator, along with counsel for the child, as *always* constituting sufficient "alternative means" of ascertaining the child's preferences.

But the law supports no such blanket ban on testimony by children in custody cases. To the contrary, Family Code section 3042, subdivision (b), merely provides that "the court shall *control the examination of the* child witness so as to protect the best interests of the child." (Italics added.) It further provides that "[t]he court may preclude the calling of the child as a witness *where the best interests of the child so dictate* and may provide alternative means of obtaining information regarding the child's preferences." (Italics added.) These two passages allow no room for a blanket policy of exclusion of the testimony of all children.

And in this case, I perceive no particular basis for the refusal to hear from Taylor. There seems a general consensus that Taylor, aged 12, was remarkably intelligent and mature. He had already been questioned about his feelings regarding the move by at least two custody evaluators, as well as by Foreman. It is unclear why a direct inquiry from the court, especially if conducted in a sensitive manner, and outside the presence of his parents, would have been particularly hard on him. Unless I presume that the best interests of *every* child dictate a preclusion of his testimony, as the trial court seemed to, there is no readily apparent reason to exclude Taylor from the decision. At any rate, a decision to exclude him should have been based on factors pertaining to him and his case, not an abstract policy against hearing from children.

And finally neither of the "alternative means" employed by the court here—the appointment of a custody evaluator and of counsel—resulted in any admissible evidence. Counsel, of course, did not testify at all. He merely advocated. And the custody evaluator, while certainly useful for some purposes, could not qualify as an "expert" on the subject of "what Taylor wants." That is an ordinary factual matter. (See Evid. Code, § 720.) The only person who could offer admissible evidence on that subject was Taylor.

It is a matter of judicial discretion to determine whether or not a child such as Taylor should testify. But that decision must be based upon the court's actual exercise of discretion—based upon the particular child and the circumstances of the case—unfortunately in this case it was not.

Appellant's petition for review by the Supreme Court was denied February 17, 2007, S148578.