Filed 3/20/15  Marriage of Turner CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re the Marriage of JENNIFER and MATTHEW TURNER. | |
| JENNIFER TURNER, | E059449 |
| Appellant, | (Super.Ct.No. SWD014793) |
| v. | OPINION |
| MATTHEW TURNER, | |
| Respondent. | |

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge.

Affirmed.

Carolyn Chapman for Appellant.

Matthew Turner, in pro. per., for Respondent.

## I

## INTRODUCTION

Following a contentious child custody trial, the trial court found that it was in K

1

Turner's best interests to leave her mother's home and reside primarily with her father, Matthew Turner (Father). Jennifer Turner (Mother) appeals the August 13, 2013 order. Mother contends the trial court abused its discretion in ordering primary physical custody of K. (born in May 2005) changed to Father. Mother argues Father did not satisfy his substantial burden of proving changed circumstances, detriment, or that giving Father primary custody was in K.'s best interests. Mother also argues the trial court's failure to appoint counsel for K. violated K.'s due process rights.

We conclude that because the parents were unofficially sharing joint physical custody 50/50 when Father relocated, the trial court correctly considered de novo the best interests of the child when determining whether to modify custody. In doing so, the court did not abuse its discretion in giving Father primary custody, because Mother had a history of alienating K. from Father and not adequately providing for her child's physical and emotional needs. We also reject Mother's objection to the trial court not sua sponte appointing counsel for K. The judgment is affirmed.

II

FACTS AND PROCEDURAL BACKGROUND

In February 2005, Mother and Father married. Their daughter, K., was born in May 2005, while Mother and Father were living in North Carolina, where Father was stationed with the Marines.

In December 2005, Father was deployed to Iraq. Mother and K. lived with K.'s maternal grandparents (grandparents) in San Diego during Father's deployment until

2

September 2006.  Upon Father's return, the family moved to North Carolina.  In February 2007, Father received emergency orders for deployment to Iraq.

**Mother and Father Separate**

On February 3, 2007, Mother and Father separated, and Mother and K. moved to Temecula, California.  Father remained in North Carolina.  Father's orders for deployment to Iraq were cancelled.  Instead, he participated in Desert Talon exercises, beginning in March 2007, and thereafter was deployed to Iraq until February 2008.

Meanwhile, in October 2007, Mother had gastric bypass surgery.  She suffered complications, requiring bed rest and a feeding tube until late March 2008.  Mother was in and out of the hospital until January 2008, and had in-home nursing care until mid-February 2008.  Between October 2007 and mid-December 2007, maternal grandmother assisted Mother in caring for K.  Upon Mother's doctor's advice, at the end of December 2007, K. began staying with paternal grandmother in Sacramento.  Upon returning from deployment in February 2008, Father resided in North Carolina and later relocated to California.

In March 2008, Mother was still unable to care for K. because of Mother's health.  Mother agreed to allow K. to stay with Father in North Carolina while Mother continued to recover.  Mother agreed to this on the condition Father would return K. to her when Mother was well enough to care for her.  Father promised to return K. upon Mother's doctor declaring Mother healthy.  In March 2008, K. and paternal grandmother went to stay with Father in North Carolina.  Father enrolled K. in preschool in North Carolina.

3

In late April 2008, Mother's doctor released her from any restrictions. Mother told Father she would be arranging for K. to return to her. Father believed it was best for K. to stay with him in North Carolina. He wanted K. to remain with him until after her birthday in May. Mother and Father agreed to celebrate K.'s birthday together. Then K. and Mother would return to California together.

In April 2008, Father submitted in North Carolina, a complaint for divorce, filed on May 5, 2008. Father told Mother on May 4, 2008, he had filed for divorce and was not going to allow K. to leave. On May 5, 2008, Mother angrily told Father she was coming to get K. The following day Father served Mother with his divorce petition. He also filed and was granted in North Carolina, a motion for an ex parte temporary custody order seeking to prevent Mother from removing K. from Father's custody and from the state of North Carolina.

**Mother Files Marital Dissolution Petition**

On May 16, 2008, Mother filed a petition for dissolution of marriage in the superior court of California, Riverside County. Mother also filed an order to show cause (OSC) seeking the return of K. to Mother, with legal and physical custody awarded to Mother and reasonable visitation ordered for Father. Mother asserted the North Carolina court did not have jurisdiction over K. because she was a resident of California. In May 2008, Father voluntarily dismissed his dissolution action filed in North Carolina.

On May 29, 2008, K.'s daycare in North Carolina notified Father that Mother had taken K. from preschool. Father was unaware Mother removed K. from preschool in North Carolina and flew her back to California. Mother had not told Father she was

4

going to do this nor had she allowed him to say goodbye to K. Between May 29 and June 12, 2008, Father called K. every night but Mother would not allow him to talk to K. Finally, on June 17, 2008, Mother permitted Father to read a bedtime story to K. because Mother's therapist said it would be best if Mother permitted K. to talk to Father.

Father filed opposition to Mother's OSC motion for temporary custody, and requested that he receive physical custody of K., with joint legal custody and visitation for Mother. In Father's attached declaration, he stated Mother had tricked him into dismissing his marital dissolution case in North Carolina. Father stated he already had temporary custody orders in North Carolina, granting him custody of K. Father agreed to dismiss his case because Mother said she wanted to move back to North Carolina to attempt to reunite with him. At the time, Father was unaware of Mother's marital dissolution petition pending in California. Father stated Mother had a history of mental instability, had been diagnosed with depression, was on medication for depression and seizures, had never lived independently, and had never maintained steady employment or completed college. Father requested the court to order an Evidence Code section 730 psychological evaluation (730 evaluation).

In July 2008, the trial court heard Mother's OSC custody modification motion and ordered a 730 evaluation. The court also ordered that the parties were to permit K. to have telephonic contact with the other parent, and K. was to stay with Father in North Carolina for six weeks, beginning on August 15, 2008. After receiving a medical discharge for a left knee problem, Father moved back to California and obtained civilian employment in San Diego and Temecula.

5

In October 2008, Father filed a response to Mother's dissolution petition. Father requested joint legal custody and primary physical custody.

In February 2009, during a hearing for review of the initial 730 evaluation, the court awarded temporary joint legal and physical custody to Mother and Father. Both parents were ordered to complete a coparenting program within 120 days. The court further ordered "week on/week off visitation," Mother to continue her therapy, Father to submit to a mental health check regarding posttraumatic stress disorder (PTSD), Father to pay $795 in monthly child support, and the parents to share equally work-related day care expenses.

In March 2009, Father filed a motion for bifurcation of marital status.

**MSA and Final Judgment of Dissolution**

In September 2009, Mother and Father executed a mandatory settlement agreement (MSA), which they acknowledged was a final and complete settlement of their rights and obligations pertaining to their property, child custody, visitation, child support, and spousal support.

On February 4, 2010, the trial court entered a final judgment of dissolution (filed on February 9, 2010), which incorporated the MSA. The parties agreed in the MSA that they would have joint legal custody, Mother would have primary physical custody, and Father would have weekend visitation every weekend except the first weekend of the month. The MSA included additional custody and visitation terms, and required the parties to work cooperatively toward furthering the best interests of the child. It was agreed the parties had the right to communicate with K. without restriction, within

6

reason, and neither parent would disparage the other or the other parent's family members within hearing distance of the child, or otherwise discourage the child from spending time with the other parent.

**Father Moves to Idaho**

According to Mother, Father was a good Father until he moved to Sacramento in 2011, and then about a month later to Idaho in 2011. Until then, while Mother and Father lived in Temecula (separately), there was an unofficial 50/50 sharing of K., and Mother and Father got along fairly well regarding K. After Father moved to Idaho, Mother was unable to talk to Father about anything concerning K., even by computer.

**Father Files OSC Motion for Child Custody Modification**

On December 14, 2011, Father filed an OSC motion for modification of custody and visitation, and ex parte visitation request. On December 14, 2011, the trial court granted Father's ex parte request for visitation during winter break, and ordered Father to return K. to Mother by December 24, 2011, at 6:00 p.m. The parties were also ordered to participate in mediation, with Father's OSC custody modification motion continued.

**February 2012 Mediation**

The parties attended mediation in February 2012, during which the mediator interviewed both parents. The mediator reported the parties were unable to reach an agreement regarding custody and visitation. Father stated he was requesting primary physical custody because he had moved to Idaho in October 2011 due to job relocation. K. was living with Mother, who was not meeting K.'s medical and educational needs. K. had been absent 31 times and tardy 14 times during the current school year (2011/2012).

She was struggling in math and had difficulty paying attention in class. In addition, Mother had many medical issues and depended on maternal grandparents to care for her but they were not in a position to do so because of their own medical issues. Maternal grandmother recently had a heart attack. Mother agreed she depended on maternal grandparents to assist her. This was because Mother does not drive due to a seizure disorder. Mother said K. missed school because she frequently got sick, because Mother was often ill.

The mediator stated in her report that she was concerned about Mother's ability to care for K., and K. frequently getting sick. Mother was taking medications for seizure, depression, and an ulcer. Maternal grandmother's health was deteriorating and maternal grandfather worked during the day. Maternal great-grandfather was home but had Alzheimer's disease. The mediator felt Mother did not fully comprehend concerns regarding her ability to meet K.'s needs. The mediator concluded Father's concerns were legitimate and that it was in K.'s best interests to give Father primary physical custody of K. The mediator noted the evaluator for the 2009, 730 evaluation expressed concerns about Mother's ability as a primary parent to care for K.

Mother filed a response to Father's OSC custody modification motion. She requested joint legal custody, with the current visitation schedule remaining in effect. Mother objected to changing custody and requested the court to disregard the mediator's recommendations. Mother explained in her declaration that she was disabled, with an epilepsy disorder, which on occasion caused seizures. She also has degenerative disc disease, and was hospitalized for three weeks in April 2011 for bleeding ulcers. Mother

8

said K. missed school because of illness. Her absences were excused and she completed her homework during those absences. K. also missed school because of a family emergency. Mother did not know why K. was marked tardy. K. normally was dropped off in front of school on time. With regard to K. struggling with math, Mother claimed Father would not agree to hire a tutor. K. and Mother were living with maternal grandparents When K. returned from visiting Father, she was often unhappy, withdrawn, and disrespectful. Mother claimed Father had been "badgering" her and K. over the phone. Mother acknowledged she and Father often had strained communications.

Father filed a declaration supporting his OSC motion, attaching documents such as a statement by the school clerk confirming K. was tardy 14 times. As to K.'s disrespectful behavior, Father believed Mother permitted it and failed to correct it. Father claimed Mother failed to share uninsured medical costs, as ordered in the divorce decree. As a consequence, Father paid all of K.'s medical expenses. Mother was blocking Father's phone number on her cell phone and limiting contact by email, not responding to his emails, and telling Father when he called, to call back later. When K. was with Father, Mother would call repeatedly, every day, interfering with Father's time with K. Father noted that when K. was with him, she was extremely talkative, but was sullen and withdrawn when she returned to Mother's home. Father believed this was because maternal grandmother yelled at everyone, causing Mother and K. to retreat to their shared bedroom.

Father further stated in his declaration that in March 2012, Mother told him she was going to have K. evaluated for ADD/ADHD (Attention Deficit/Hyperactivity

9

Disorder). Father told Mother K. did not have ADD/ADHD. Later, Mother emailed Father a diagnosis stating K. was prescribed medication, but when K. visited him, she did not bring any medication. Mother also did not accommodate Father's requests to confirm K. had checked in at the airport and had checked in baggage. Mother also did not allow him talk to K. before her flight to assure her he would be at the airport when she arrived or confirm, upon K.'s return to Mother, that K. had arrived safely and been met at the airport.

**April 2012 OSC Hearing**

During the OSC custody modification hearing in April 2012, Father stated he wanted primary custody because he was concerned about K. missing school and her school performance. Father acknowledged that, after he discussed the problem with her teacher, K. had been showing up on time and had not missed very many days, but she was still having difficulty with math and not paying attention in class. Father attempted to discuss with Mother counseling for K. but Mother rarely responded to his emails and was unavailable when he called. Father confirmed he was employed, working during the day, Monday through Friday. Mother's attorney informed the court that Mother was disabled, but was not receiving disability. Mother's family was transporting K. to school. Mother was attempting to get tutoring for K., who was in the first grade. Mother objected to a change in custody because she believed it was not in K.'s best interests.

The trial court noted the parties had poor communication with each other. The court did not adopt the mediator's recommendation to change custody because there were only six weeks left in the school year. Instead, the court made orders concerning K.'s

contact with her parents, ordered K. enrolled in counseling, and ordered the parties to cooperate in completing another section 730 evaluation. The court also continued the OSC custody modification hearing.

In May 2012, Father filed another OSC custody modification motion. Father stated in his supporting declaration that Mother had not complied with the April 2012 court order to set up Skype accounts within 10 days or the order to set up an OurFamilyWizard email account within 30 days. She also did not check her email and respond within 24 hours. Father had been informed that on April 19, 2012, the police were called to maternal grandparents' home, where Mother and K. were residing, due to domestic violence involving a fight between Mother's sisters, who moved in with their children. In addition, Father received anonymous emails with photos of Mother and K.'s excessively cluttered bedroom, and of Mother pregnant and overdosing on medication accessible to the children in the home. The emails indicated Mother isolated K. from the rest of the family in the bedroom, K. was living in a bad environment, Mother was incapable of caring for K. independently, and Mother had threatened to kill maternal grandmother. Surreptitious emails to Father from Mother's boyfriend, Ryan Bronson, also indicated Mother let MediCal insurance coverage lapse and therefore was unable to obtain counseling for K. or obtain her own medication. Bronson also said Mother was cutting herself. Copies of the emails were attached to Father's May 2012 OSC custody modification motion. At the end of July 2012, Mother gave birth to a daughter, fathered by Ryan Bronson.

11

**August 2012 OSC Hearing**

In August 2012, the trial court heard and denied Father's May 2012, OSC custody modification motion, noting Father had previously requested a 730 evaluation and expeditious resolution of the matter, but then failed to follow through on the 730 evaluation and was requesting the court to cancel the 730 evaluation. The court said it was reluctant to change custody without a 730 evaluation. The court ordered the parties to cooperate with the 730 evaluation interview and evaluation proceedings.

In October 2012, Father filed a declaration stating Mother had delayed providing him with K.'s prescription medications when K. was visiting Father. Mother also would only allow Father to speak to K. on the speaker phone and refused his calls unless he called from his home phone. In addition, he was concerned about Mother's online activity mentioning Father, and objected to Mother harassing him online. Mother posted his cell phone number, causing him to receive unsolicited calls. She called him a "D-Bag," called his girlfriend a "porn/wana b model," said Father needed "to be sterilized and castrated ASAP!," and posted a link to his girlfriend's Facebook page, stating, "If you like big *****d slutters, + this Gem;) LoL Don't tell her who sent yeh!" In addition, Mother posted photos of herself wearing only a bra, in a provocative pose. One of the photos is with K. standing next to her. Mother's "meetme.com page" was removed by meetme.com in August 2012, for violating their anti-harassment policy.

**730 Evaluation in November 2012**

In November 2012, 730 evaluator, Dr. William H. Jones, submitted a 730 evaluation report. Jones recommended Mother be the primary physical custodian. He

concluded K. had a stronger bond with Mother because K. had been in Mother's care most of the time after Father moved away to find work and lower living costs. K. was also bonded to her maternal grandparents, with whom she lived. Mother was caring for a newborn infant and was not in a relationship with the infant's father. Jones noted Mother seemed to be overwhelmed by her serious health problems. The previous school year K. had excessive absences but, according to her teacher, K.'s attendance, behavior, and academic achievement had significantly improved. Another concern was that Mother did not obtain counseling for K. or investigate low cost counseling opportunities, although Mother believed K. needed counseling, and delayed having K. evaluated for medication for ADHD. In addition, Mother appeared to be seriously depressed.

Jones stated that Father was employed, pursued his education, and has a history of military service. He shares outdoor interests with K. and appears more likely to help K. develop her potential, including independence and self-sufficiency. Jones noted, however, he has an eight-year-old son, with whom he has had no contact, although he paid regular child support. Jones stated this raised a question as to Father's parental potential for K. However, Father explained during his interview that his son resulted from a "one night stand," and the mother did not allow him to see the child because she had married someone else and told the child her husband was the child's father.

Jones noted the school K. attended in Temecula ranked as a very strong school, whereas the school she would attend in Idaho was ranked a weak school that "needs improvement." Jones recommended Mother be given primary physical custody based on

the following *LaMusga*[1] factors: "1) Continuity would be best served by remaining with the mother. 2) The distance of the move would [be] great, from Southern California to Idaho. 3) [K.]'s age is seven, magnifying any negative effects. 4) The relationships of the child with both parents is positive. The bonding with the mother is stronger since she has provided most of the care of the child during the last year. 5) In regards to gate keeping, both parents have promoted the child's relationship with the other parent when they were equally sharing custody. Since then Ms. Turner has not interfered with visitation of [K.] with her father. Recently both parents appear to be about equal in terms of promoting the relationship of the child with the other parent. 6) The child's wishes are not considered given her tender years. 7) Mr. Turner's reasons for the proposed move have been discussed above. 8) The predominant share of the present custody has been with the mother, making the potential negative emotional effects of the move greater. The LaMusga factors support continued predominant custody of the child with the mother. In regards to support systems, Ms. Turner offers the presence in the home of the grandparents. The school for [K.] at the mother's would be stronger. Mr. Turner is more likely to engage [K.] with other people and other activities outside the home. If [K.] resided with her father she would have less contact with her new sister, but her father would have more energy and emotional energy for [K]."

In January 2013, Mother filed a declaration stating that the day before K. was to fly back from visiting Father, Mother unsuccessfully tried calling K. to confirm her flight.

---

[1] *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072 (*LaMusga*).

14

Father would not answer Mother's calls. Mother also stated that when Father had visitation, he merely dropped her off at his mother's home. Also, when Father moved, he refused to give Mother his address and told K. to lie about where she was staying with him. Mother further stated paternal grandmother did not allow her to speak to K. on the phone and constantly caused problems. Paternal grandmother would call the sheriff's department if Mother did not answer her calls. Mother requested the court to limit Father's recommended visitation because he was not spending time with K. He was leaving her with his mother.

In response to Mother's declaration, Father filed a declaration that significant events had occurred after the November 2012 730 evaluation. Father therefore requested the court to disregard the 730 evaluation recommendations as not valid. Father reported that Mother had attempted suicide, failed to follow visitation agreements, continued to harass Father and his fiancé, and lied in her most recent declaration. Also, on November 17, 2012, Bronson text messaged Father and told him Mother was hospitalized following an attempted suicide. Father was concerned Mother's depression would endanger K. Father further reported that Mother was still putting the speaker phone on when he called and using his calls to intimidate and alienate K. from Father. Father denied he had not exercised his visitations with K. and requested the court to deny Mother's request to allow K. to spend spring break with Mother, since otherwise he would not see K. from January until June. In addition, his wedding was during spring break. The wedding date was chosen then so K. could attend the wedding.

Father further stated that Mother had reneged on an agreement that K. would fly to visit Father on December 24, 2012. On December 21, 2012, Mother told Father K. would not fly on December 24, 2012, because the flight was too early in the morning. But the flight was early because it was the only one Father could get for an unaccompanied minor. As a consequence, K. did not fly that day, as agreed. Father rebooked the flight for after Christmas and was only able to see her five days, instead of 10. Father believed Mother was harassing him because he was engaged. Mother criticized him for bringing another person into K.'s life and referred to her derogatorily as "fiancs," "fianci," and "FB." In addition, while K. was visiting, Mother called the police to do a welfare check on his residence for no valid reason. The police went to Father's fiancé's ex-husband's home instead because Mother gave the police the ex-husband's address.

In February 2013, the court ordered the parties to split spring break, and set Father's OSC custody modification motion for an evidentiary hearing.

In March 2013, Father married Jamie Turner. Jamie has a daughter (six years old) and a son (eight years old). Jamie shares custody and visitation of her two children with her ex-husband.

**730 Evaluation Update in May 2013**

In May 2013, the parties stipulated to Jones providing an updated 730 evaluation report. Jones interviewed Mother, Father, Father's wife, Jamie Turner, and K. He also observed K. interact with Father. Jones concluded from interviewing K. that Mother had coached K. for the interview and Mother had made alienating statements to her about Father and Jamie. Jones also found that K. "is experiencing significant emotional distress

16

because of the high level of conflict between her mother and father, some of which occurs in her presence during exchanges or phone calls.  Both parents appear to under appreciate the negative affects of their conflict on [K.].  [Mother], by her account, has had [K.] to two counseling sessions since the last evaluation in August, 2012.  [Mother] continues to be dependent on her parents for transportation as she does not have a driver's license, but apparently is eligible for one.  [Father's] life appears to have been grounded more after his recent marriage to Jamie Turner.  Jamie Turner appears to be a positive addition to [K.]'s life.  I do not see any signs of fearfulness or anxiety on the part of [K.] in regards to her father."

Jones concluded that, "Because of [K.]'s strong emotional attachments to her mother, maternal grandparents, and sister, and her involvement in a strong school, I would be reluctant to change custody for [K.]to be with her father predominately."  Jones also concluded "I see no reason to limit the father's contact with [K.], and see him as providing a positive affect on [K.]'s life."  In addition, Jones stated that, if the parents lived in the same area, he would have no hesitancy to recommend equal, shared custody. Jones noted that K. needed psychotherapy for emotional distress caused by her parents' high level of conflict regarding custody, visitation, transition periods, and phone communication.

**Evidentiary Hearing on Father's OSC Custody Modification Motion**

In August 2013, the court conducted a short cause trial and evidentiary hearing on Father's OSC custody modification motion, filed in December 2011.  On August 13, 2013, the trial court issued a detailed minute order on the OSC motion, stating that the

court had focused on the following two critical issues: "What is in the best interest of the child, [K.]?" and "Which parent is most likely to facilitate [a] close and continuing bond between the child and the non-custodial parent." The court order further stated it considered the following factors under *LaMusga, supra,* 32 Cal.4th 1072: "the child's interest in stability and continuity of the current custody arrangement, the distance of the move, the child's age, the child's relationship with both parents, the relationship between the parents, the child's wishes, the reasons for the move, and the current custody arrangement." The court found that circumstances had substantially changed for the parties since the judgment entered in February 2010. In the court's minute order, the court listed detailed findings as to both parents and balanced those findings, concluding it was in K.'s best interest that she reside primarily with Father.

III

MODIFYING CHILD CUSTODY

Under California statutory law governing child custody and visitation determinations, "the overarching concern is the best interest of the child. The court and the family have 'the widest discretion to choose a parenting plan that is in the best interest of the child.' (Fam. Code, § 3040, subd. (b).)[2] When determining the best interest of the child, relevant factors include the health, safety and welfare of the child, any history of abuse by one parent against the child or the other parent, and the nature and amount of contact with the parents. (§ 3011.)" (*Montenegro v. Diaz* (2001) 26

---

[2] Unless otherwise noted, all statutory references are to the Family Code.

18

Cal.4th 249, 255 (*Montenegro*); *In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 955 (*Yana*).)

Although when making an initial child custody order, California statutory law only requires the trial court "to ascertain the 'best interest of the child' (e.g., §§ 3011, 3020, 3040, 3087), this court has articulated a variation on the best interest standard once a final judicial custody determination is in place. Under the so-called changed circumstance rule, a party seeking to modify a permanent custody order can do so only if he or she demonstrates a significant change of circumstances justifying a modification" (*Montenegro, supra,* 26 Cal.4th at p. 256, citing *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 37 (*Burgess*)) and that "a different custody arrangement would be in the child's best interest" (*Yana, supra,* 37 Cal.4th at p. 956). This serves to protect the weighty interest in a stable custody arrangement and also fosters judicial economy. (*Ibid.*)

The instant case involves a permanent custody order. On February 4, 2010, the trial court entered a final judgment of dissolution, incorporating an MSA. Mother and Father acknowledged in the MSA that the MSA was a final and complete settlement of their rights and obligations pertaining to their property, child custody, visitation, child support, and spousal support. The final judgment was filed on February 9, 2010.

The changed circumstance rule supplements, rather than supplants, the statutory best interest test. It provides that once there has been a final custody order in which the court has determined that a particular custodial arrangement is in the best interests of the child, the court need not reexamine that question. Instead, the court "'should preserve the

19

established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest.'" (*Montenegro, supra,* 26 Cal.4th at p. 256, quoting *Burchard v. Garay* (1986) 42 Cal.3d 531, 535.)

In a move-away case, in which a parent with sole physical custody relocates, the custodial parent has the presumptive right to move with the child, subject to the trial court's power "to restrain a removal that would prejudice the rights or welfare of the child." (§ 7501, subd. (a); *Burgess, supra,* 13 Cal.4th at p. 32.) The noncustodial parent may oppose the relocation and seek custody modification based on a showing of (1) a substantial change of circumstances rendering it ""'"essential or expedient for the welfare of the child"'"" to change custody (*Burgess,* at p. 38) and (2) the custodial parent's proposed relocation will be detrimental to the noncustodial parent's relationship with the child. (*Yana, supra,* 37 Cal.4th at pp. 957-959; *LaMusga, supra,* 32 Cal.4th at p. 1078.) Once the noncustodial parent has met his or her burden of establishing changed circumstances and detriment, the normal best interest analysis applies. (*Yana,* at p. 960; *LaMusga,* at p. 1098.)

A move-away case involving joint physical custody is treated differently. When a parent who shares joint physical custody requests to relocate their child, the trial court must decide de novo what physical custody arrangement would be in the child's best interests. (§ 3087; *Niko v. Foreman* (2006) 144 Cal.App.4th 344, 365 (*Niko*); *Mark T. v. Jamie Z.* (2011) 194 Cal.App.4th 1115, 1124 (*Mark T.*) The joint custody moving parent does not have the presumptive right to change the child's residence and bears no burden

20

of proving the move is essential or imperative. (*Niko,* at pp. 363-364; *Burgess, supra,* 13 Cal.4th at pp. 38-39.)

**A. Joint Physical Custody**

Mother contends she had primary custody. She argues that, because Father did not have either sole or primary physical custody, he was required to show significant changed circumstances and detriment in order for the court to modify custody and give him primary custody. We disagree.

As in *Niko*, here, the trial court properly considered child custody de novo in determining whether relocation of K. was in her best interests. (*Niko, supra,* 144 Cal.App.4th at p. 365; § 3087.) In *Niko*, the mother requested modification of a joint custody judgment, in which the parties had 50/50 joint physical custody. The mother wanted sole physical custody so as to facilitate her moving out of state with the child. The court held in *Niko* that the trial court properly considered child custody de novo in determining whether relocation of the child would be in the child's best interests. (*Id.* at p. 365.)

Relying on section 3087, the *Niko* court rejected the father's contention that the changed circumstance rule applied. (*Niko, supra,* 144 Cal.App.4th at p. 362.) Section 3087 provides that "[a]n order for *joint custody* may be modified or terminated upon the petition of one or both parents or on the court's own motion if it is shown that the best interest of the child requires modification or termination of the order." (Italics added.) The term "joint custody," is defined in section 3002 as "joint physical custody and joint legal custody." Under section 3004, "'[j]oint physical custody' means that each of the

21

parents shall have significant periods of physical custody.  Joint physical custody shall be shared by the parents in such a way so as to assure a child of frequent and continuing contact with both parents, subject to Sections 3011 and 3020."

The *Niko* court explained that, "When the parents have joint physical custody, modification of the coparenting arrangements is not a change of custody requiring change of circumstances.  Instead, the trial court has wide discretion to choose a parenting plan that is in the best interest of the child.  [Citation.]  The joint custody moving parent does not have the presumptive right to change the child's residence, and bears no burden of proving the move is essential or imperative.  [Citation.]  *Nor does the opposing nonmoving parent bear the burden of showing substantial changed circumstances require a change in custody or that the move will be detrimental to the child.*" (*Niko, supra,* 144 Cal.App.4th at pp. 363-364 (italics added); in accord, *Mark T., supra,* 194 Cal.App.4th at p. 1126.)  The *Niko* court added that "The value in preserving an established custodian arrangement and maintaining stability in a child's life is obvious.  But when the status quo is no longer viable and parents have joint custody, a court must review de novo the best interest of the child.  It can fashion a new time-share arrangement for the parents." (*Niko,* at p. 364.)

Under *Niko* and section 3087, Father was not required to show changed circumstances or detriment, because the parents had joint physical custody.  Before Father relocated, both parents had significant periods of physical custody.  (§ 3004.)  Although the 2010 judgment ordered joint legal custody and shared physical custody, with Mother given primary physical custody, in family law move-away custody cases, the

22

courts have looked beyond the label of the joint custody order to the "existing de facto arrangement between the parties to decide whether physical custody is truly joint or whether one parent has sole physical custody with visitation rights accorded the other parent." (*In re Marriage of Biallas* (1998) 65 Cal.App.4th 755, 760; see *In re Marriage of Lasich* (2002) 99 Cal.App.4th 702, 715 [where "a father has a child only 20 percent of the time, on alternate weekends and one or two nights a week, this amounts to sole physical custody for the mother with 'liberal visitation rights' for the father"]; *Brody v. Kroll* (1996) 45 Cal.App.4th 1732, 1737 [although a mother was awarded "primary physical custody" of a child, the parents had "an actual joint custody arrangement" where the father saw the child four to five times a week].)

Here, both parties indicated that, following the 2010 judgment, the parties unofficially shared physical custody 50/50 up until Father moved away. The 2010 judgment states Father had physical custody a minimum the every weekend except the first weekend of the month, from Friday evening until Sunday evening. If Father had off the Friday or Monday of those weekends, his custody would be extended 24 hours to include the day off. All other visitation would be by mutual agreement of the parties. Holiday visitation, which parties shared equally, superseded regular shared custody.

The trial court appropriately found the 2010 judgment awarded joint legal and joint physical custody, and, notwithstanding the judgment, the parties informally agreed to a 50/50 share of physical custody while Father lived in the area. Therefore, under *Niko* and section 3087, the trial court properly reviewed de novo the best interest of the child

23

and fashioned a new time-share arrangement for the parents. (*Niko, supra,* 144 Cal.App.4th at p. 364.)

## B. Best Interests of the Child

Mother contends Father failed to rebut the presumption that it was in K.'s best interest to remain with Mother or establish K. would suffer a detriment if allowed to continue living with Mother. The court in *Niko* stated that there was no such presumption in a joint physical custody move-away case or burden of proof. (*Niko, supra,* 144 Cal.App.4th at pp. 363-364.) Furthermore, in the instant move-away case, Mother, who claimed to be the custodial parent, did not relocate. Father relocated.

In the seminal move-away case, *LaMusga, supra,* 32 Cal.4th 1072, the mother, who had primary physical custody moved to modify visitation to permit her to relocate with her children to another state. The *LaMusga* court held that the father satisfied his initial burden of showing that the mother's planned move would cause detriment to the children, requiring a reevaluation of the children's custody. The *LaMusga* court further held that the trial court properly considered the relevant factors and did not abuse its discretion in deciding that a change in primary custody from the mother to the father would be in the best interests of the children if the mother moved out of state. (*Id.* at p. 1079.) Although the instant case is distinguishable from *LaMusga* in that Mother and Father had joint physical custody and Mother did not relocate, *LaMusga* is instructive on determination of the best interests of the child.

The *LaMusga* court stated regarding determining the best interests of the child, "Among the factors that the court ordinarily should consider when deciding whether to

24

modify a custody order in light of the custodial parent's proposal to change the residence of the child are the following: the children's interest in stability and continuity in the custodial arrangement; the distance of the move; the age of the children; the children's relationship with both parents; the relationship between the parents including, but not limited to, their ability to communicate and cooperate effectively and their willingness to put the interests of the children above their individual interests; the wishes of the children if they are mature enough for such an inquiry to be appropriate; the reasons for the proposed move; and the extent to which the parents currently are sharing custody." (*LaMusga, supra,* 32 Cal.4th at p. 1101; see § 3011.)

In the instant case, the trial court stated in its August 2013 custody modification order that it focused on two issues: What was in the best interests of K. and which parent was likely to facilitate a close and continuing bond between K. and the noncustodial parent. The trial court stated that in ruling on modification of child custody, the court considered the *LaMusga* factors in making its custody determination. The court listed the following factors and evidence, which it considered and balanced, in reaching its ruling:

- K. was experiencing significant anxiety over the high level of conflict and animosity between her parents, some of which was in K.'s presence, during phone calls and exchanges;

- the 730 evaluator described interaction between Father and K. as "warm, friendly, and relaxed";

- parents are unable to communicate effectively and amicably with each other;

25

- Mother intends to tell K. all the negative things about Father when she turns 18;

- Mother did not permit K.'s court-ordered visitation with Father for Christmas 2012;

- Mother scheduled K.'s spring break return flight from visiting Father on Father's wedding day;

- Mother engaged in publically disparaging Father and his new wife, including on the internet;

- Mother listed Father's phone number as her own on Mother's dating website;

- Mother prohibited Father from picking up K. for summer visitation because he did not give her a written itinerary, which was not court-ordered, and called Father a "f------ deadbeat" while K. was nearby;

- when maternal grandmother wished K. well as she left with Father, Mother told maternal grandmother, "F--- you.  I want my f------ itinerary";

- during this incident, law enforcement had to facilitate the exchange of K. to Father;

- before K.'s most recent visit with Father, Mother cut out K.'s photo from a photo of K. and Father, and placed the photo of just Father in K.'s suitcase;

- while in Mother's care, K. had 21 unexcused absences from school and 14 tardies;

- the 730 evaluator concluded in his 730 evaluation report that he believed Mother had coached K. prior to her interview and had made alienating statements about Father and his wife to K.;

- Mother's 730 evaluation test scores indicated Mother has emotional challenges, including "wounded pride syndrome" and "Dependent Personality Disorder with avoidant, self-defeating, and borderline personality traits";

- Father has fewer emotional challenges than Mother;

- according to Jones, Father's new wife is a positive addition to K.'s life;

- Mother wants K. to spend less time with Father during summer vacation.

The court found these factors favoring primary custody with Father outweighed the following factors favoring Mother:

- K. has a strong emotional attachment to Mother and maternal grandparents;

- maternal grandparents provided much of the parenting to K., including providing food, shelter, transportation, and financial support of Mother and K.;

- the 730 evaluator described the interaction between Mother and K. as "very spontaneous and comfortable" and K. was "exuberant";

- both parents made it difficult for the other parent to contact K. by phone;

- Father did not provide Mother with his address when he first moved to Idaho;

27

- Father did not list Mother as an emergency contact at K.'s daycare in Idaho;

- Father did not contact K.'s teachers in California concerning her school progress;

- the 730 evaluator reported that Father's test scores indicate he is likely to focus a great deal on rules and time schedules, and be rigid and stubborn.

The record shows the trial court carefully considered and weighed the evidence and all of the above factors in determining whether to award Father primary custody. In reaching its ruling awarding Father primary custody, the trial court stated that it recognized the change of custody would have a significant impact on K. in the short term, but the court believed, in the long term, it was more likely Father would meet K.'s physical and emotional needs. The court further stated Father was in the best position to lessen the emotional harm to K. and to encourage a close and continuing bond with the noncustodial parent.

As the *LaMusga* court noted there are no "'bright line rules'" in determining whether to modify custody. (*LaMusga, supra,* 32 Cal.4th at p. 1089.) The trial court has "'''the widest discretion to choose a parenting plan that is in the best interest of the child.''' [Citation.] This requires the court to consider all the circumstances.''' (*Id.* at p. 1091, quoting *In re Marriage of Bryant* (2001) 91 Cal.App.4th 789, 793.) It is apparent from the record the trial court carefully did so. The above enumerated factors and evidence favoring awarding Father primary custody, outweigh the factors and evidence favorable to giving Mother primary custody.

Although the November 2012 730 evaluation and May 2013 update recommended Mother have primary custody of K., the November 2012 evaluation occurred over a year after Father relocated and the May 2013 update occurred over a year and a half after Father's relocation. During that time, while Father's OSC to modify custody was pending, K. remained with Mother, and there no longer was 50/50 joint physical custody. The 730 evaluator based his custody recommendation primarily on the fact that K. had been living primarily with Mother and her maternal grandparents. But prior to Father's relocation, the parties indicated K. had spent equal time with both parents. It was not until Father moved to Idaho for employment reasons and filed his OSC for custody modification, that K. lived primarily with Mother. Furthermore, the 730 evaluator erroneously concluded that, after Father relocated, Mother did not interfere with Father's visitation of K. and both parents appeared to be promoting K.'s relationship with the other parent. The record shows this was not accurate. There was evidence Mother was not cooperating with visitation, was making derogatory remarks about Father, including on the internet, and was intentionally interfering with Father's relationship with K.

In addition, in February 2012, about six months after Father relocated, the mediator concluded giving Father primary custody was in K.'s best interest. The mediator, who interviewed both parents, expressed concern about Mother's ability to care for K. and Mother's health. Also, maternal grandmother's health was deteriorating, maternal grandfather was gone during the day, working, and maternal great-grandfather was home with Alzheimer's disease. The mediator found that Mother did not fully comprehend concerns regarding her ability to meet K.'s needs, and Father's concerns

29

were legitimate. The mediator noted the evaluator for the 2009, 730 evaluation also expressed concerns about Mother's ability to care for K. as a primary parent.

In the May 2013 730 evaluation update, the 730 evaluator stated that, because K. went to a strong school and had close attachments to Mother, maternal grandparents, and K.'s 10-month-old sister, "I would be reluctant to change custody for [K.] to be with her father predominately." The evaluator added that he saw no reason to limit Father's contact with K., and concluded Father provided a positive effect on K.'s life. The evaluator noted K. needed therapy for emotional distress caused by her parents' highly contentious dispute over custody, visitation, transition periods, and phone communication. Mother had not made a concerted effort to arrange for such therapy.

The record also shows that in the interim period between the 730 evaluation in November 2012, and the 730 evaluation update in May 2013, Mother had attempted suicide in 2005 and 2012, failed on several occasions to cooperate with visitation, harassed Father and his fiancé, attempted to prevent K. from being present at Father and his fiancé's wedding, and committed acts intended to alienate K. from Father and interfere with his efforts to talk with K. on the phone. The evaluator also noted that his interview of K. in May 2013, indicated Mother had coached K. for the interview and had been making alienating statements to K. about Father and Jamie.

The totality of the evidence supports the trial court's finding that giving Mother primary custody would be detrimental to K., not only because of diminishing the time K. would spend with Father from the unofficial 50/50 shared custody prior to Father's relocation, but also because giving primary custody to Mother would facilitate her

30

incessant harassment of Father, her efforts to alienate K. from Father, and interference with K.'s contact and communication with Father. "'Conduct by a custodial parent designed to frustrate visitation and communication may be grounds for changing custody.' [Citations] ['[A] custodial parent's attempt to frustrate the court's order has a bearing upon the fitness of that parent'].) Even if the custodial parent is otherwise 'fit,' such bad faith conduct may be relevant to a determination of what permanent custody arrangement is in the minor children's best interest. (Citation; Fam. Code, § 3040, subd. (a)(1) ['In making an order granting custody to either parent, the court shall consider, among other factors, which parent is more likely to allow the child frequent and continuing contact with the noncustodial parent . . . .'].)" (*Burgess, supra,* 13 Cal.4th at p. 36, fn. 6.)

Here, the trial court reasonably found that preserving the status quo of primary custody with Mother, after Father relocated, was not in K.'s best interests because of Mother's history of frustrating Father's contact with K. The court concluded it was more likely Father would provide K. with a better home environment and meet her physical and emotional needs, as well as ameliorate any detrimental effects of changing primary custody to Father. Also, Father was more likely than Mother to encourage K. to maintain her relationship with the other parent. "Essentially, the court concluded that the mother's past conduct made it unlikely that she would facilitate the difficult task of maintaining the father's long-distance relationship with [K.]." (*LaMusga, supra,* 32 Cal.4th at p. 1095.)

In addition, there was substantial evidence that long term Father was more likely than Mother to provide K. with a stable home than Mother. Mother was living with her

31

parents, was unemployed and unable to drive, was supported primarily by her parents, suffered from significant physical and mental health issues, had attempted suicide, and had given birth to another child fathered by someone no longer involved with Mother. Father, on the other hand, was employed, had his own home, and had remarried. The 730 evaluator concluded Father appeared to have become more grounded after his remarriage, and Father's new wife appeared to be a positive addition to K.'s life. The evaluator concluded Father would provide a positive effect on K.'s life and there was no reason to limit Father's contact with K.

Although the evaluator stated he was "reluctant" to recommend changing custody from Mother to primary custody with Father, this was because of K.'s strong attachment to Mother, maternal grandparents, and K.'s younger sister. The record shows that K. also had a strong attachment to Father as well, and up until he relocated, Mother and Father were sharing custody 50/50. Once Father relocated, Mother proceeded to disparage Father and his new wife, interfere with Father's efforts to visit and communicate with K., harassed and disparaged Father, and attempted to alienate K. from Father. Because of Mother's history of such behavior and, in giving great deference to the trial court's adjudication of the facts, we conclude the trial court did not abuse its discretion in awarding Father primary custody based on finding it was in K.'s best interests. (*LaMusga, supra,* 32 Cal.4th at p. 1090.)

Mother argues the trial court's order giving Father primary custody improperly punished her for her past conduct of making disparaging remarks about Father on the internet. There is nothing in the record that indicates the trial court acted out of a desire

to punish or reward either parent.  The trial court reasonably concluded it was in K.'s best interests to give Father primary custody, based in large part on Mother's past conduct, which indicated it was unlikely Mother would encourage and facilitate K.'s relationship with Father, and adequately care for K.'s physical and emotional needs, if Mother had primary custody.

IV

COUNSEL FOR K.

Mother contends the trial court denied K. her constitutional due process rights by failing sua sponte to appoint counsel for her.  We disagree.

Under section 3150, subdivision (a), "If the court determines that it would be in the best interest of the minor child, the court may appoint private counsel to represent the interests of the child in a custody or visitation proceeding, provided that the court and counsel comply with the requirements set forth in Rules 5.240, 5.241, and 5.242 of the California Rules of Court."[3]  The trial court may sua sponte appoint counsel for a child under section 3251, subdivision (b).

Rule 5.240, subdivision (a), regarding appointment considerations, provides: "In considering appointing counsel under Family Code section 3150, the court should take into account the following factors, including whether:

(1) The issues of child custody and visitation are highly contested or protracted;

---

[3]  Undesignated rule references are to the California Rules of Court.

(2) The child is subjected to stress as a result of the dispute that might be alleviated by the intervention of counsel representing the child;

(3) Counsel representing the child would be likely to provide the court with relevant information not otherwise readily available or likely to be presented;

(4) The dispute involves allegations of physical, emotional, or sexual abuse or neglect of the child.

(5) It appears that one or both parents are incapable of providing a stable, safe, and secure environment;

(6) Counsel is available for appointment who is knowledgeable about the issues being raised regarding the child in the proceeding;

(7) The best interest of the child appears to require independent representation; and

(8) If there are two or more children, any child would require separate counsel to avoid a conflict of interest."

Mother argues the trial court should have appointed independent counsel for K. because this case has been very contentious and, without counsel, K.'s voice regarding custody was not heard. Although this case has been highly contentious, the record does not show K.'s interests were overlooked. Mother has not established that any of the factors listed in rule 5.240, other than that the case has been contentious. She therefore has not demonstrated the trial court abused its discretion in not sua sponte appointing counsel for K.

Furthermore, even if counsel should have been appointed for K., the absence of counsel was not prejudicial, particularly since, as the trial court stated in its August 13, 2013 order, "Because of the child's young age, the court did not give any significant weight to her wishes." The record demonstrates K.'s best interests were considered and taken into account by the court. Mother has not shown that independent counsel for K. would have made any difference in the outcome of this case.

V

DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


HOLLENHORST
Acting P. J.


MILLER
J.

35